**Brenna LEWIS, Plaintiff,**

v.

**HEARTLAND INNS OF AMERICA, L.L.C., d/b/a Heartland Inn, Ankeny, Barbara Cullinan, and Kristi Nosbisch, Defendants.**

No. 4:07–cv–00287.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 13, 2008.

David J. Dutton, Dutton Braun Staack Hellman Iversen, Erin P. Lyons, Dutton Braun Staack Hellman PLC, Waterloo, IA, for Defendants.

Andrew L. LeGrant, Mark D. Sherinian, Sherinian & Walker PC, West Des Moines, IA, for Plaintiff.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court is Defendants', Heartland Inns of America, L.L.C. ("Heartland Inns"), Barbara Cullinan ("Cullinan"), and Kristi Nosbisch ("Nosbisch") (collectively "Heartland"), Motion for Summary Judgment and Request for Oral Argument, filed on June 5, 2008. Clerk's No. 14. Plaintiff, Brenna Lewis ("Lewis"), filed a Resistance and Request for Oral Argument on July 14, 2008. Clerk's No. 21. Heartland filed a reply on August 1, 2008. Clerk's No. 28. The Court does not believe that a hearing would materially aid

resolution of the issues, and the matter is fully submitted.

## I. FACTS [1]

Heartland Inns is a domestic limited liability company with its home office in Waterloo, Black Hawk County, Iowa. Compl. at ¶ 5; Answer at ¶ 5. Heartland provides lodging accommodations in eighteen locations throughout Iowa. Heartland Inns website, http://www.heartlandinns.com/ (last visited November 2, 2008).

Lewis worked at the Heartland Inn Waterloo–Crossroads location as a Night Auditor from July 6, 2005 until approximately November 20, 2006. Pl.'s App. at 82. The Night Auditor is a front desk position at the hotel scheduled between 11:00 p.m. and 7:00 a.m. Pl.'s Statement of Additional Facts ¶¶ 7, 17. The Night Auditor is responsible for checking customers in and out, setting up breakfast, and book work. Pl.'s App. at 72, 80. Lewis left her position at the Waterloo–Crossroads location because of a move from the Waterloo area to the Ankeny/Des Moines area. Id. at 66, 81–82. After tendering her resignation and engaging in a brief job search for positions other than available Heartland Inns positions, Lewis, with the assistance of Lisa Gowdy ("Gowdy"), her former General Manager at the Waterloo–Crossroads Heartland Inn, inquired into available positions with Heartland Inns in the Des Moines area. Id.

In December 2006, Lewis started working part-time at both the Altoona and Ankeny Heartland Inn locations and began to train for the Night Auditor position on a part-time basis at the Ankeny location. Id. at 25–26, 39, 84–85, 135. Lewis was offered a fulltime position as a Guest Service Representative ("GSR") by the General Manager of the Ankeny Heartland Inn, Lisa Stifel ("Stifel"), after the morning shift ("A shift") GSR, Morgan Hammer ("Hammer"), tendered her resignation on December 15, 2006.[2] Id. at 39.

The A shift GSR position is scheduled between 7:00 a.m. and 3:00 p.m. Id. at 71. The GSR job description states:

> [c]reates a warm, inviting atmosphere with helpful, professional services, by discerning, anticipating and providing for the needs of our guests; relays information about accommodations and services available; encourages and receives reservations and performs all related activities. Accurately records changes, conducts cash transactions and related reports.

Defs.' App. at 36. The qualifications for the GSR position listed in the Heartland Inns Personnel Manual [hereinafter "Personnel Manual"] are:

1. The following sets forth both disputed and undisputed statements of material fact.

2. The parties dispute the facts surrounding the hire of Lewis as a fulltime GSR at the Ankeny Heartland Inn. They dispute whether Lewis's written resignation, dated October 10, 2006, became effective before she began her inquiries into possible employment with Heartland Inns locations in the Des Moines area. Pl.'s Statement of Facts ¶ 5. They disagree about whether the hire was a transfer or a re-hire and whether the hire was approved by Cullinan. Pl.'s Statement of Additional Facts ¶¶ 29–30; Defs.' Statement of Facts ¶ 11. Heartland asserts that all GSR hires must be authorized by the Director of Operations and that Lewis's hire was not approved. Defs.' Statement of Facts ¶¶ 8–11; Defs.' App. 32, 43, 46, 49. Nosbisch states that Stifel did not have Heartland Management authorization for the re-hire of Lewis. Defs.' App. 59–60. Lewis asserts that Cullinan authorized the offer of a full-time GSR position to Lewis in a phone conversation with Stifel. Stifel testified that in response to Stifel's inquiry about hiring Lewis for the fulltime front desk position, "[Cullinan] stated something like, 'If that's what she wants, offer it to her.'" Pl.'s App. at 39.

[m]inimum High School or equivalent plus 1 year experience in field which demanded good public relations and sound communication skills. Experience in or the ability to learn operation of cash register, PBX/phone systems, progressive office equipment; pc/software knowledge helpful. Successful retail or commission sales experience helpful.

*Id.* at 37.

Lewis began to work full-time as the A shift GSR at the Ankeny Heartland Inn following the departure of Hammer on December 29, 2006. Pl.'s App. at 39. The parties dispute, however, the sequence, dates, and content of the interactions between Cullinan, the Director of Operations for Heartland Inns (Pl.'s Resp. to Defs.' Statement of Facts ¶ 1 (hereinafter "Pl.'s Resp. to Facts")) and Lewis, as well as the details of several interactions between Cullinan and Stifel. From Lewis's account, Cullinan first observed Lewis at the Ankeny Heartland Inn in early January 2007. Pl.'s Statement of Additional Facts ¶ 33. Stifel testified that Cullinan, immediately after observing Lewis at the front desk of the Ankeny Heartland Inn, spoke to Stifel in her office about Lewis's appearance. *Id.* at ¶¶ 34–36; Defs.' Resp. to Pl.'s Statement of Additional Facts ¶¶ 34–36.[3] (hereinafter "Defs.' Resp. to Facts"). Stifel also states that after observing Lewis's appearance, Cullinan expressed concern about Lewis as an A shift GSR, stating she had a "gut feeling" about Lewis, and she asked Stifel to speak to Lewis about dressing more professionally. Pl.'s App. at 39–40, 134. Both parties agree that in the days shortly following these first observations of Lewis, Cullinan also called Stifel to discuss Lewis's appearance and interaction with guests. Pl.'s Statement of Additional Facts ¶¶ 39–41, 45, 48; Defs.' Resp. to Facts ¶¶ 39–41, 45, 48. In this phone con-

versation, Cullinan expressed her unhappiness with the loss of the previous GSR and stated that Lewis lacked the "Midwestern girl look." Pl.'s Statement of Additional Facts ¶ 40. Stifel states that, based on what Cullinan told her, she believed "[Lewis's] appearance, [Lewis's] looks or whatever, was not what Barb wanted on the front desk." Pl.'s App. at 134; Pl.'s Statement of Additional Facts ¶ 45.

On January 9, 2007, Cullinan asked Stifel for her resignation from the position of General Manager at Heartland Inn Ankeny. Pl.'s Statement of Additional Facts ¶¶ 58–59. After Stifel's resignation, Stifel told Lewis that Cullinan had said Lewis lacked the "Midwestern girl look." *Id.* ¶¶ 61–62. Approximately two weeks later, on January 23, 2007, Cullinan met with Lewis in the manager's office at the Ankeny Heartland Inn. *Id.* ¶ 63. The parties agree that Cullinan told Lewis that she would have to interview for her A shift GSR position. *Id.* ¶ 64. Beyond this initial agreement, Plaintiff and Defendants describe the tone of this meeting in vastly different terms. Lewis states that she challenged the interview requirement by pointing out that other staff members had not been required to interview under similar circumstances. *Id.* ¶ 68. She stated that she thought that Cullinan was requiring her to interview because she purportedly did not have the "Midwestern girl look" and alleged "unlawful employment practices." *Id.* ¶¶ 67–69, 105, 109. Lewis asserts that even though she felt the interview requirement was discriminatory, she neither refused nor agreed to the interview. *Id.* ¶ 91. Lewis also described her perspectives on several new Heartland Inns' policies, during which Lewis suggested that the new policies were responsible for lower revenues. *Id.* ¶ 73. Lewis reports that she was upset and cried

---

**3.** Defs.' Resp. to Facts ¶ 34 incorrectly cites to "D. Supp. App. 5." Instead, Page 68 of Culli-

nan's deposition as cited can be found at Defs.' App. 5.

throughout most of the meeting because she believed that Cullinan wanted her to move back to the Night Auditor position. *Id.* ¶ 89. Defendants dispute Lewis's characterization of her statements in the meeting and assert that Lewis was argumentative throughout the meeting. Defs.' Statement of Facts ¶ 13. Lewis denies displaying hostility to Cullinan in the January 23, 2007 meeting and asserts that she did not refuse to abide by or express opposition to Heartland Inns' policies, nor did she refuse to be interviewed for the A shift GSR position. Pl.'s Statement of Additional Facts ¶¶ 87, 90–92.

Shortly following this encounter, on either January 24 or 25, 2007, Cullinan discussed the January 23 meeting with several of Heartland's human resources and management personnel, namely: Nosbisch, the Human Resource Director for Heartland; Jean Orwig ("Orwig"), a personnel consultant and former Director of Human Resources for Heartland; and Sandy Minard ("Minard"), advisor to the general operations for Heartland. Pl.'s Resp. to Facts ¶¶ 2, 23. Cullinan, Nosbisch, Orwig, and Minard discussed and mutually agreed on the termination of Lewis in this meeting. *Id.* ¶¶ 24–25; Pl.'s Statement of Additional Facts ¶¶ 93–97; Pl.'s App. at 13, 58–59, 113, 120; Defs.' App. at 57. They were primarily concerned about Lewis's confrontational attitude toward Cullinan. Pl.'s App. at 13, 37, 114.

In accordance with Cullinan, Nosbisch, Orwig, and Minard's mutual decision, Lewis's employment was terminated on January 26, 2007. Pl.'s Resp. to Facts ¶ 25; Pl.'s Statement of Additional Facts ¶ 82. Nosbisch and Orwig drafted the Status Change Report that was Lewis's termination notice. *See* Pl.'s Statement of Additional Facts ¶ 150; Defs.' App. at 58, 159–61. The Status Change Report stated:

Ms. Lewis was advised that a second interview would be necessary to confirm/endorse Ms. Lewis's shift assignment. Ms. Lewis became argumentative and refused the procedure defined, and said Heartland cannot require her to interview for the position. Further discussion of Heartland's rights in scheduling employees to meet the needs of the hotel and explanation of Heartland's policies/procedures to train employees to meet these needs did not bring any visible understanding or acceptance from Ms. Lewis; [sic] She remained argumentative, refusing to accept Heartland's itinerary in processing and developing staff to meet guest needs.

What Ms. Lewis did instead was to voice disagreement with Heartland's most recent policies establishing the Heartland Inns · as smoke free, with no pets allowed, and that credit cards are required with guest registrations. Ms. Lewis identified these as the reasons for low hotel occupancy, citing that employees were not a problem, herself included.

Ms. Lewis is openly hostile toward Heartland's implemented guest service policies and is not amenable to management supervision and direction (thwarting the proposed interview procedure). Because of this, we have had a significant deterioration in our level of trust and confidence in Ms. Lewis's interests and willingness to carry out the requirements of this position in upholding Heartland's standards with and for our guests. Employment is hereby terminated for these reasons.[4]

---

4. The Personnel Manual states:

Employees must ... follow supervisory directives; and refrain from insubordinate acts, or be subject to discipline.... Employees are subject to discipline, up to and including termination, by the Director of Operations, Manager or designee, for the following (but not limited to these) reasons,

Defs.' App. at 58. The Status Change Report is signed by Lewis and Layli Springer, temporary General Manager of the Ankeny Heartland Inn. *Id.* The Status Change Report is dated January 26, 2007 and bears a handwritten note above Lewis's signature stating, "I do not agree with the above statements, but I did receive a copy." *Id.*; Pl.'s Statement of Additional Facts ¶¶ 82, 86.

Lewis describes both her own and her predecessor, Hammer's, manner of dress, noting that her own appearance does not conform to a feminine sex stereotype. Pl.'s Statement of Additional Facts ¶¶ 42–44, 49–56. Lewis avers that she prefers loose-fitting clothes and men's slacks, she rarely wears make-up, and she wears her hair short with minimal styling. *Id.* It is undisputed that Cullinan has stated that "[h]otels have to have a certain personification and appearance." Pl.'s App. at 28. Lewis also alleges that Cullinan has boasted about the appearance of the women on the Heartland Inns' staff, has stated that front desk people should be "pretty," and has declined to hire a female applicant because she was not "pretty enough." Pl.'s Statement of Additional Facts ¶¶ 4, 6, 9. The Dress Code for front desk positions is set forth in the Personnel Manual:

> Required: Business attire for Front Desk, no polo shirts for women. . . .
>
> WOMEN: Option 1: Dresses, skirts, and suits are encouraged. Skirts and dress shorts *must be* knee length or longer. Bare legs are acceptable but must be shaved and smooth, toes pedicured/painted and accompanied by conservative dress sandals/footwear (no flip flops or sports sandals).

> Option 2: Skirts, slacks, or capri pants must be solid color, khaki, black, or navy, and accompanied by an oxford shirt or a short-sleeved "camp" shirt (Summer only) and a tie or bow. During cool weather the oxford shirt may be accompanied with a sweater. Bare legs are acceptable but must be shaved and smooth, toes pedicured/painted and accompanied by conservative dress sandals/footwear (no flip flops or sports sandals).
>
> MEN: Option 1: Dress slacks and shirts with tie, or with a sport coat jacket, or suit and tie are encouraged. Option 2: Slacks must be solid color, khaki, black, or navy, accompanied by an oxford shirt and tie (no bow ties). During warm weather, solid color polo shirts may be allowed as approved. During cool weather an oxford shirt may be accompanied with a sweater.

Defs.' App. at 33.[5] Following Lewis's termination, the A shift GSR position was temporarily filled by Ashley Adams ("Adams") and permanently filled by another female employee. Pl.'s App. at 9. Lewis provides no description of either Adams's or the permanent replacement's manner of dress.

Lewis and Heartland present contradictory information regarding Lewis's job performance while employed at Heartland. Lewis supplies evidence that multiple employees at the Ankeny Heartland Inn found her work performance satisfactory. Pl.'s App. at 9, 71, 131. Defendants include negative observations of Lewis's work performance and appearance. Defs.' Statement of Facts ¶¶ 28–34; Defs.' Resp.

---

and may be terminated at any time with or without cause: . . . Conduct unbecoming [of] an employee . . . [i]nsubordination, including failure to follow management directives. Employees are expected to remain amiable to supervision.
Defs.' App. at 35.

**5.** In addition, the Personnel Manual presents dress code guidelines reserving for the Manager and Director of Operations the final determination of what is acceptable from the options of professional-formal or uniform attire. Defs.' App. at 33.

to Facts ¶¶ 114–16. The parties also disagree whether a second interview is a standard requirement for GSR hires and transfers. Defendants point to the language of the Personnel Manual, which states "[u]nless otherwise authorized, *Second Interviews are required for all positions.*" Defs.' App. at 32. Defendants also point to the sworn testimony of three Heartland General Managers that second interviews were conducted by Cullinan when hiring for a GSR position. Defs.' App. at 43, 46, 49. Lewis argues that the Manual language "all positions" does not encompass transfers and asserts the language "unless otherwise authorized" indicates that a second interview is not necessarily required. Pl.'s Resp. to Facts ¶ 8. Lewis further presents sworn affidavits from several Heartland Inns General Managers that either do not mention a second interview requirement or disavow knowledge of a policy requiring interviews for transfers. *Id.*; Pl.'s App. at 21, 23, 26, 38. Lewis also asserts that neither her predecessor nor her replacement were required to interview before they began to work at the front desk. Pl.'s Statement of Additional Facts ¶¶ 78–79.

## II. STANDARD FOR SUMMARY JUDGMENT

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not enti-

tled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is " 'not to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

Employment actions are inherently fact based, and the Eighth Circuit has

repeatedly cautioned that in employment discrimination cases, summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted); *see also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) ("[S]ummary judgment should seldom be used in employment-discrimination cases."); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.—W. Campus*, 160 F.3d 484, 486–87 (8th Cir.1998)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any.[6] *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

Lewis sues Heartland under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Iowa Civil Rights Act ("ICRA") for sex discrimination and retaliation. 42 U.S.C. § 2000e et seq.; Iowa Code, 216.1 et seq. Specifically, Lewis pleads in her complaint that Defendant Heartland terminated Lewis's employment because she did not appear to act like the stereotypical

---

**6.** Plaintiff presents an abbreviated standard for summary judgment that focuses on the important role of the jury as fact finder. *See* Pl.'s Br. in Resistance to Defs.' Motion for Summary J. at 4 (hereinafter "Pl.'s Br.") (stating that fact determinations should be left exclusively to the jury and the court must disregard all evidence favorable to the moving party that the jury is not required to believe and summarily concluding summary judgment should seldom be utilized in employment cases). Plaintiff's proffered standard, however, fails to acknowledge the Court's duty on motion for summary judgment to assess whether a genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Later in her brief, Plaintiff cites language from *Snyder v. Louisiana*, —— U.S. ——, 128 S.Ct. 1203, 1212, 170 L.Ed.2d 175 (2008), for the proposition that "the proffer of a pretextual explanation naturally gives rise to an inference of discriminatory intent," without noting that quoted language addresses the legal standard applicable to a *Batson* inquiry, not a Title VII employment discrimination claim. *See* Pl.'s Br. at 20. In both instances, the Court notes that a straight acknowledgment of the appropriate legal standard would be more helpful than these incomplete statements of law.

woman. Compl. ¶¶ 16, 21. She further asserts that she was fired due to her opposition to what she perceived to be a demand by her employer that was in violation of Title VII and the ICRA. Compl. ¶¶ 25–26, 30–31. Defendants deny Lewis's claims and assert that summary judgment is appropriate on the present record because: (1) Lewis cannot establish a prima facie case of sex discrimination; (2) Defendant had a legitimate, nondiscriminatory reason to terminate Lewis and Lewis cannot establish that the termination decision was pretextual; and (3) Lewis cannot establish a prima facie case of retaliation. As set forth below, the Court agrees with each of Defendants' contentions and, thus, grants Heartland's Motion for Summary Judgment.

### A. Sex Discrimination

■ Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." .42 U.S.C. § 2000e–2(a)(1). The relevant language in 42 U.S.C. § 2000e–2(a)(1) and Iowa Code § 216.6(1)(a) are nearly identical and federal case law supplies the basic framework for deciding cases under the ICRA. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1380 (8th Cir.1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (Iowa 1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law . . . is not controlling." *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Neither party posits any separate legal arguments regarding Lewis's ICRA claims. Therefore, the Court will address Lewis's federal and state law claims of sex discrimination together.

Here, Lewis asserts that her appearance does not conform to sex stereotypes held by Cullinan, or society as a whole, and that she was discriminated against based on her nonconformance with traditional gender stereotypes.[7] This, she claims, is enough to make out a claim for sex discrimination under Title VII. To the Court's knowledge, no court in the Eighth Circuit has had the opportunity to consider a claim like that presented by Lewis—that is, one in which the plaintiff claims that her employer's disparate treatment of her in comparison to other women, due to her employer's sex stereotyping, is actionable sex discrimination.[8] The Court disagrees with Lewis's overly-broad characterization of the protection afforded by Title VII and, thus, addresses the scope of the prohibition against sex discrimination under Title VII before proceeding to consider Lewis's claims.

When Congress amended Title VII with the Pregnancy Discrimination Act in 1978, it provided that the "terms 'because of sex'

---

7. In crafting her novel claim, Lewis frames her arguments without relying on many of the common legal terms of art familiar to sex discrimination law and, thus, the framing of her legal arguments is often less than clear. Because Lewis is arguing for a novel interpretation of sex discrimination under Title VII, her arguments frequently do not directly address the more conventional legal arguments presented in Heartland's Motion for Summary Judgment.

8. In *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068–71 (8th Cir.2005), the Eighth Cir-

cuit had occasion to consider whether a same-sex sexual harassment claim arising from sex stereotyping formed a basis for an actionable Title VII claim. In *Pedroza*, the Eighth Circuit rejected the plaintiff's proposed theory on the basis that the discrimination was not "because of sex." *Id.*; *but cf. Schmedding v. Tnemec Co.*, 187 F.3d 862, 865 (8th Cir.1999) (holding that under the liberal pleading standard, a complaint that stated facts of same-sex sexual harassment, including facts suggesting sex stereotyping, was sufficient to survive a motion to dismiss).

or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions." Pub. L. No. 95–555, 92 Stat. 2076. These specific inclusions provide little guidance in determining the breadth of protection afforded employees by Title VII's prohibition against sex discrimination, especially given the increasing recognition that sexual identity is mutable. *See, e.g., Ulane v. E. Airlines, Inc.,* 742 F.2d 1081, 1084 (7th Cir.1984) (reversing a district court's recognition of a Title VII claim for discrimination against a transsexual, but noting that " 'sex is not a cut-and-dried matter of chromosomes,' but is in part a psychological question—a question of self-perception, and in part a social matter—a question of how society perceives the individual"); *Smith v. City of Salem,* 378 F.3d 566, 573 (6th Cir.2004) (holding that *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), extended "sex" to include "gender," which refers to "socially-constructed norms associated with a person's sex" such that Title VII encompasses discrimination on the basis of transgender status). In *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court acknowledged that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." In the same opinion, the Supreme Court was clear that, though the courts have broadened the expanse of causes of actions that are actionable under Title VII, at the base of any

Title VII claim there must be a difference in treatment of the sexes that puts one sex at a disadvantage in comparison to the other. *See id.* at 80, 118 S.Ct. 998 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)).[9]

■ In support of her proposed sex stereotyping Title VII cause of action, Lewis extensively cites *Price Waterhouse,* 490 U.S. at 231–33, 250–51, 109 S.Ct. 1775, in which the Supreme Court recognized that sex stereotyping may be a form of discrimination when a woman's behavior is held unfavorably against a gender-specific stereotype and results in discrimination compared to similarly situated men. Despite Lewis's attempt to characterize *Price Waterhouse* more broadly, the Supreme Court in *Price Waterhouse* was clear that while sex stereotyping may be a component of a sex discrimination claim, a plaintiff claiming actionable disparate treatment must demonstrate that the plaintiff's sex is the basis of the disparate treatment and that the disparate treatment is based on a comparison to the opposite sex. *See Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. 1775 ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the

---

9. Lewis predominately relies on sexual harassment case law in support of her sex stereotyping claim. Lewis's reliance on the sexual harassment case law for her broader conception of Title VII protections is misplaced given the United States Supreme Court's clear statement in *Oncale* (a same-sex

sexual harassment case) that the fundamental basis for a Title VII cause of action is a situation in which persons of one sex are disadvantaged in a way that persons of the other sex are not, because of their sex. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998

entire spectrum of *disparate treatment of men and women* resulting from sex stereotypes.'" (internal citation omitted) (emphasis added)); *see also Creed v. Family Express Corp.,* No. 06–465, 2007 WL 2265630, at *3 (N.D.Ind. Aug. 3, 2007) (summarizing the facts and legal arguments in *Price Waterhouse* to conclude "it was the *disparate treatment of men and women* by sex stereotype that violated Title VII" (emphasis added)).

■ Thus, as an initial matter, the Court clarifies that the mere existence of sex stereotyping is not enough, in and of itself, to support an actionable claim under Title VII. To make out a Title VII disparate treatment claim, the plaintiff must show that the treatment to which she was subjected is such that it puts her sex at a disadvantage compared to persons of the opposite sex.[10] A plaintiff may make a showing of discrimination by demonstrating that the basis of the adverse employment action was because of her lack of conformance with a gender stereotype, but there must also be an accompanying showing that the other sex is not so disadvantaged by similar gender stereotyping.[11]

### 1. Direct evidence analysis.

■ The standard of review for sex discrimination employment claims is well-established in the Eighth Circuit. To establish a claim of sex discrimination under Title VII, a plaintiff may prove discrimination by using either direct or indirect (circumstantial) evidence. *See Putman v. Unity Health Sys.,* 348 F.3d 732, 734 (8th Cir.2003). "If the plaintiff produces direct evidence that an illegitimate criterion, such as gender, 'played a motivating part in [the] employment decision,'" then "the burden shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have reached the same employment decision absent any discrimination." *Cronquist v. City of Minneapolis,* 237 F.3d 920, 924 (8th Cir.2001) (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775).

Lewis does not define the evidence she presents as either direct or indirect. *See* Clerk's Nos. 1, 21, 23. Her argument includes extensive citation of *Price Waterhouse,* however, suggesting perhaps that she believes the Court should use the direct evidence, mixed motive analysis

10. Besides *Price Waterhouse,* Lewis cites only one other disparate treatment case in support of her argument for a Title VII sex stereotyping cause of action. From the Sixth Circuit *Smith* opinion, she quotes: "After *Price Waterhouse,* an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex." *Smith,* 378 F.3d at 574. Indeed, such a factual situation may be a valid basis for a sex discrimination action if the plaintiff can also demonstrate the other elements necessary to maintain a discrimination claim. The *Smith* court, in fact, applied the same four elements required of a prima facie disparate treatment case familiar to the Eighth Circuit courts, including a showing that "[the plaintiff] was treated differently from similarly situated individuals outside of his protected class." *Id.* at 570.

11. Such an approach not only follows from the statutory language, it also accords with existing case law which allows employers to impose grooming and dress code requirements that reflect societal expectations. General appearance standards such as the dress code set forth in the Personnel Manual are often upheld when the employee is a point of public contact for the employer. *See, e.g., Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1215 (8th Cir.1985) (finding that a female news anchor was not subjected to sex discrimination when her employer television station applied its appearance standards); *Jespersen v. Harrah's Operating Co., Inc.,* 444 F.3d 1104, 1112 (9th Cir.2006) (en banc) (holding a casino's grooming policy, which required female bartenders to wear make-up, was not sufficient to give rise to a claim of sex stereotyping under Title VII).

under *Price Waterhouse.* Later in her arguments, though, she suggests three alternative legal standards which mirror to various degrees the *McDonnell Douglas* analysis, suggesting that she expects the Court to apply a burden shifting analysis that is applicable when only circumstantial evidence supports the plaintiff's claim. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). For the sake of thoroughness, the Court will evaluate the record to determine if the evidence is sufficient to qualify as direct evidence of sex discrimination.

■■ Direct evidence of sex discrimination is:

> evidence that establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision. Direct evidence includes evidence of conduct or statements by persons involved in the decision[ ]making process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor.

*Shaffer v. Potter,* 499 F.3d 900, 904 (8th Cir.2007) (internal quotations and citations omitted). The only piece of evidence presented by Lewis that could be construed as directly related to Lewis's termination is the January 5, 2007 comment allegedly made by Cullinan, a decision maker in Lewis's later termination, that Lewis lacked the "Midwestern girl look." [12] Lewis is correct in pointing out that Cullinan was closely involved in the decision to terminate Lewis's employment with Heartland, but Lewis must prove more. While "stereotyped remarks can certainly be evidence that gender played a part" in an employer's decision, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." *Price Waterhouse,* 490 U.S. at 251, 109 S.Ct. 1775.

■ Even viewed in the light most favorable to Lewis, neither the words, nor the context in which the "Midwestern girl look" statement was made, provide sufficient support to draw an inference that a discriminatory attitude against women was more likely than not a motivating factor in Lewis's later termination. First, the words "Midwestern girl look" do not, in and of themselves, indicate discriminatory animus on the part of Cullinan against women generally, or against a subset of women in comparison to men. Neither do the words take on a discriminatory meaning when placed in context. Cullinan's "Midwestern girl look" is insufficiently linked to Lewis's termination to be sufficiently probative of the ultimate question of intent behind Lewis's termination. Though Cullinan was a decision maker in the later decision to terminate Lewis, the conversation on January 5 was the only occasion when Cullinan made a comment referring to Lewis's sex, and that conver-

---

**12.** Defendants assert that the "Midwestern girl look" comment is inadmissible hearsay. Defs.' Memorandum of Authorities in Supp. of Defs.' Mot. for Summ. J. at 7–8. Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The "Midwestern girl look" comment by Cullinan about Lewis's appearance is offered by Lewis, not to prove the truth of the matter asserted, but rather "to demonstrate Cullinan's state of mind, motivations, and perception of Lewis." Pl.'s Br. at 15. Lewis correctly states that the statement falls outside of the hearsay definition.

sation did not contain any discussion of Lewis's termination or any other disciplinary action. The three week period separating the comment on January 5 and the termination on January 26 provides temporal isolation which tends to dispel any direct link between the comment and Lewis's termination. More significantly, the negative interaction between Cullinan and Lewis on January 23 intercedes between Cullinan's concern about Lewis's appearance and the decision to terminate Lewis's employment. While the comment and circumstances clearly suggest that the management of Heartland was concerned about the appropriateness of Lewis's appearance for a daytime front desk position, there is no direct evidence that these concerns were the basis of her termination. Accordingly, the Court finds that Cullinan's use of the phrase "Midwestern girl look" several weeks before Lewis's termination is insufficient to support a finding by a reasonable fact finder that discriminatory animus toward Lewis's sex, or a subset of women, actually motivated the decision to terminate her.[13]

### 2. *Indirect evidence analysis.*

■■■ Having concluded that Lewis has failed to present direct evidence of discriminatory animus, the Court turns to an examination of the circumstantial evidence of intentional discrimination under the three-stage burden shifting approach developed by the Supreme Court in *McDonnell Douglas Corp.*, 411 U.S. at 802–05, 93 S.Ct. 1817, and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407

(1993); *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 980 (8th Cir.2001). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. 1089. The burden then shifts back at the third and final stage to the plaintiff, who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.* at 253, 101 S.Ct. 1089. The ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id.*

■■■ To establish a prima facie case of sex discrimination, a plaintiff must demonstrate that: (1) she is within a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably, or circumstances permit an inference of discrimination. *See Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir.2008); *Devin v. Schwan Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007); *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir.2000); *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th

---

**13.** The allegation that Cullinan sought to hire only "pretty" front desk personnel is also insufficient to provide direct evidence of a discriminatory attitude toward a subset of women in general. As with the "Midwestern girl look" comment, the meaning and connotations of the word are innocuous, and there is no demonstrable causal link, or even a temporal link, between the comment and Lewis's termination.

Cir.2000). Under either formulation of the fourth element of the prima facie case, the court's analysis begins with an inquiry into the treatment of the plaintiff in comparison to other similarly situated employees, with an eye toward disparities in treatment. *Compare Canady v. Wal–Mart Stores, Inc.*, 440 F.3d 1031, 1034 (8th Cir. 2006) (examining whether the circumstances permit an inference of discrimination and concluding the facts did not permit an inference of discrimination because the plaintiff failed to present evidence that his employer treated other similarly situated employees differently), *with Schoffstall*, 223 F.3d at 825 (inquiring whether similarly situated employees outside the protected class were treated more favorably and affirming that the circumstances did not permit an inference of discrimination because the plaintiff failed to present evidence that similarly situated male employees were treated differently). For this case, the Court adopts the "circumstances permit an inference of discrimination" test as the fourth prima facie element. Thus, the Court may consider as relevant all evidence offered by Lewis that she was treated disfavorably in comparison to persons outside the protected group, *i.e.*, evidence that Plaintiff's duties were assumed by a person outside the protected class, that Plaintiff is one of a small number of females in a sea of males, that the decision makers made discriminatory comments in the employment decision, and evidence of pretext, though such evidence will not be dispositive. *See Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F.Supp.2d 1103, 1137–38 (S.D.Iowa 2007) (providing a thorough review of the legal standard for the "causality" element of the prima facie case and requiring circumstances that suggest discrimination); *Putman*, 348 F.3d at 736 (stating evidence of pretext may gave rise to an inference of discrimination).

### a. *Plaintiff's alternative standards of analysis.*

Heartland proposes that the Court evaluate Lewis's sex discrimination claims under the indirect evidence standard laid forth in *McDonnell Douglas*. Lewis, on the other hand, argues that the *McDonnell Douglas* framework in its standard form is inappropriate for the type of sex discrimination claim asserted and proposes that the Court adopt one of three alternative standards of analysis for her "more nuanced" sex stereotyping discrimination claim. Pl.'s Br. in Resistance to Defs.' Mot. for Summ. J. at 12 (hereinafter "Pl.'s Br."). First, Lewis suggests the Court inquire only into two elements presented in Eighth Circuit Pattern Jury Instruction § 5.01: "[F]irst, that the defendant discharged the plaintiff; and second, the plaintiff's sex played a part in the defendant's decision." Pl.'s Br. at 12. Lewis provides no legal rationale for the proposition that a non-binding jury instruction is an acceptable alternative to the legal standards handed down by the United States Supreme Court and the Eighth Circuit. The Court rejects, therefore, what it considers an unsound legal proposal.

Lewis next suggests that the Court skip stage one of the three step burden-shifting inquiry under *McDonnell Douglas*, thus eliminating the prima facie case inquiry.[14]

---

**14.** Lewis cites *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C.Cir.2008), in which the District of Columbia Court of Appeals held that "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." Already, the Tenth Circuit has acknowledged the new approach adopted by *Brady*, but has declined to follow its lead, finding utility in the prima facie examination. *Hinds v.*

*Id.* at 13. In response to plaintiff's second suggestion, the Court notes that not only is the initial requirement of a showing by a plaintiff of a prima facie case firmly established by United States Supreme Court precedent, but also that this standard continues to be applied by all of the Circuit Courts of Appeals, save for the District of Columbia Court of Appeals. Moreover, regardless of whether the first stage is employed, the plaintiff still bears the ultimate burden of persuasion that the motive behind the adverse employment action was discriminatory. *See, e.g., St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742 (listing the many cases in which the Court has stated its "repeated admonition that the Title VII plaintiff at all times bears the 'ultimate burden of persuasion' "). Thus, the Court declines to deviate from United States Supreme Court and Eighth Circuit precedent that set forth a burden shifting framework in which the first stage inquires whether a plaintiff has established a prima facie case of sex discrimination.

▬ The third suggestion Lewis makes is that the Court adopt a standard of the prima facie case that differs slightly from the standard often articulated by the Eighth Circuit. Lewis suggests that the Court ask, in reference to the second element of the prima facie analysis, whether "the plaintiff competently performed the position she held" and, in reference to the fourth element of the prima facie analysis, whether "some other circumstance suggests a discriminatory motive for the termination," Pl.'s Br. at 14 (citing *Strohn v. Assoc. Fin. Serv. Co.*, No. 00–3008, 2001 WL 1112112, at *2 (N.D.Cal. Sept. 18, 2001)), rather than the conventional Eighth Circuit articulation of those elements: whether "she was qualified for her position" and whether "the circumstances permit an inference of discrimination." *See Bearden*, 529 F.3d at 831; *Devin*, 491

F.3d at 785. Since the Eighth Circuit adheres to the Supreme Court's prescriptions that the prima facie case "operates as a flexible evidentiary standard" and was "never intended to be rigid, mechanized, or ritualistic," the Court considers each of Plaintiff's suggested variations in turn. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)); *see also Riser v. Target Corp.*, 458 F.3d 817, 820 (8th Cir.2006).

▬ The Eighth Circuit has noted that "a plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective," as it pertains to the second element of the prima facie case. *See Harrison v. United Auto Group*, 492 F.3d 972, 974 (8th Cir.2007). Though the formulation of the second element proposed by Lewis varies slightly from the language customarily adopted in the Eighth Circuit for disparate treatment termination cases, the underlying inquiry is the same. Under either formulation, the Court would inquire if Lewis meets the minimum and objective qualifications as set forth by Heartland in its personnel policies. Since there is no material difference between Lewis's formulations and the precedential standards, the Court will apply the formulation of the second prima facie element established by the Eighth Circuit.

Likewise, with regard to the fourth prima facie element, the Court will respect, as it must, the Eighth Circuit's precedential opinions. Indeed, after reviewing the Plaintiff's cited case, *Strohn*, the Court considers the phrasing proposed by Lewis misleading. After articulating the fourth element as "some other circumstance suggests a discriminatory motive for the ter-

*Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202    n. 12 (10th Cir.2008).

mination," the District Court for the Northern District of California went on to state that the plaintiff "must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is *more likely than not* that such actions were based on a [prohibited] discriminatory criterion." *Strohn,* 2001 WL 1112112, at *2 (internal citations omitted) (emphasis added). Despite Plaintiff's selective quotation, the *Strohn* court relied on one of the same considerations the Eighth Circuit regularly considers when examining if there is evidence giving rise to an inference of discrimination, namely, evidence that the plaintiff was treated disfavorably in comparison to persons outside the protected group. *Id.* at *3 (finding that the employer's replacement of the female plaintiff with four men suggested a discriminatory motive and, thus, satisfied the fourth element of the prima facie case of gender discrimination).

### b. *Lewis's prima facie case.*

Heartland concedes that Lewis is a member of a protected class. Because it is uncontested that Lewis was terminated, Lewis has demonstrated that she suffered an adverse employment action. Heartland argues that Lewis cannot establish either the second or the fourth elements of her prima facie case. Lewis must now provide sufficient evidence to show that there is a genuine issue for trial on each of these elements. *See Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

■ Heartland contends that Lewis cannot establish that she was qualified for the position because she had previously resigned from her employment with Heartland and because she did not complete the required second interview. Viewing the evidence most favorably to Lewis, she has presented sufficient evidence that a reasonable jury could surmise both that her transfer/rehire had been approved by Cullinan and that it was common practice to forego a second interview when hiring for the front desk position, either of which would eliminate the requirement of a second interview per Heartland Inns' policy. Heartland also argues that Lewis was not qualified because of her sub-par performance as an A Shift GSR at the Ankeny Heartland Inn. While Heartland is entitled, at trial, to rely on evidence that its subjective criteria and subjective impressions, free from any discriminatory animus, made Lewis unqualified for the GSR position, at this stage of summary judgment, the Court finds that Lewis met the minimum objective qualifications for the position as laid forth in the Personnel Manual. *See Harrison,* 492 F.3d at 974 ("A plaintiff's burden at the prima facie stage is less onerous where the employer's hiring criteria are subjective."); *Lyoch v. Anheuser–Busch Cos., Inc.,* 139 F.3d 612, 615 (8th Cir.1998) ("This lighter burden at the prima facie stage is justified by the fact that subjective criteria for promotions 'are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination.' " (internal citations omitted)). Given that Lewis appears to meet the minimal qualifications listed for the GSR position and that she provided evidence that her work performance was satisfactory, the Court finds Lewis qualified for the A shift GSR position.

■ The summary judgment dispute, therefore, turns on the fourth element of Plaintiff's prima facie case. Heartland argues that Lewis cannot establish that other similarly situated employees were treated more favorably. As discussed above, the Court applies the slightly more expansive standard which allows Lewis to meet the fourth prima facie element if she demonstrates that the discharge occurred under circumstances giving rise to an in-

ference of discrimination. It is Lewis's burden to "present evidence sufficiently supporting disputed material facts that a reasonable jury could return a verdict in her favor." *Green v. Franklin Nat'l Bank of Minneapolis,* 459 F.3d 903, 913 (8th Cir.2006) (quoting *Jackson v. Arkansas Dep't of Educ.,* 272 F.3d 1020, 1025 (8th Cir.2001)).

Lewis must do more than demonstrate that she does not conform to sex stereotypes held by Cullinan or society as a whole, or even that her termination resulted from her failure to conform to a female stereotype. To make a showing of circumstances that permit an inference of discrimination, she must bring forth evidence showing that women as a group, or a subset of women, are disadvantaged in a way that men are not disadvantaged because of Heartland's sex stereotyping. Lewis has not attempted to compare her treatment to similarly situated male employees, the most straight-forward manner to give rise to an inference of sex discrimination. Lewis provides no description of men hired for front desk positions nor testimony regarding Cullinan's beliefs about the required physical appearance of those men.

Rather, Lewis relies solely on evidence describing Heartland Inn's female GSR employees. She presents testimony from a Heartland General Manager stating that Cullinan "boasted about the appearance of the women on the Decorah staff," emphasized that front desk workers should be "pretty," and even declined to hire a female applicant because she was not "pretty enough." While it is true that "pretty" typically describes a feminine attractiveness, the record indicates that both male and female GSR employees at Heartland Inns are held to the same business dress standard, as demonstrated by comments by Cullinan that "hotels have to have a certain personification and appearance" and Heartland Inns' professional front desk dress code which specifies similar male and female attire. Lewis has not demonstrated that Heartland's preference for a certain physical appearance among its front desk workers had a disproportionate effect on men versus women in Heartland's employment practices. Cullinan's use of vaguely gender specific terms on two occasions, neither of which have a significant connection to Lewis's termination, is insufficient to raise an inference that Lewis was terminated on the basis of sex stereotyping. Lewis, accordingly, fails to make out the fourth element of her prima facie case.[15]

#### c. *Heartland's nondiscriminatory reason and pretext.*

■ Even assuming Lewis had established a prima facie case of discrimination, her claim would nonetheless fail because Heartland has stated a legitimate, nondiscriminatory reason for her termination. *See Clegg v. Arkansas Dep't of Corr.,* 496 F.3d 922, 926 (8th Cir.2007). Here, Heartland's explanation for Lewis's termination is that she was fired because Lewis was "openly hostile toward Heartland's implemented guest service policies and is not amenable to management supervision and direction." Defs.' App. at 58. This stated reason satisfies Heartland's burden of production at this stage.

■ Once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove that the defendant's reason is merely a pretext for discrimination. *Clegg,* 496 F.3d at 926. "A reason cannot be proved to be 'a pretext for discrimina-

---

15. Lewis argues that Heartland's pretextual explanation gives rise to an inference of discriminatory intent. As discussed below, Lewis fails to demonstrate that the reasons provided for her dismissal were pretextual.

tion' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. 2742. "The threshold question when considering pretext is whether [the employer's] reasons for its employment actions are true, not if they are wise, fair or correct." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir.2002).

■ Lewis argues that Heartland presented shifting renditions of the termination decision. "[F]alse or shifting reasons support a finding of illegal motivation," *EEOC v. Wal–Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir.2007), but Lewis's attempt to characterize the situation surrounding and the reasons for the termination decision as shifting fails. It is clear from the record that Cullinan, Nosbisch, Orwig, and Minard mutually agreed that Lewis should be terminated after the January 23 meeting. Each has testified that they took part in discussions and agreed on the decision based on Lewis's refusal to participate in a second interview for the GSR position and concerns that Lewis did not support Heartland Inns' policies.[16] Lewis presents no evidence that contradicts their consistent accounts of the termination decision, nor any evidence that Nosbisch, Orwig, and Minard had any knowledge of Cullinan's desire that front desk personnel conform some sex stereotype.

■ Lewis also asserts that because she and Cullinan describe the January 23 meeting differently, Cullinan's alternative rendition of the facts demonstrates pretextual motivations. While true that "[a] plaintiff may prove pretext by showing that the employer's stated reason for the adverse employment action has no basis in fact," *Wal–Mart Stores,* 477 F.3d at 570, this argument misses its mark because Lewis points to only minor factual differences between her own and Cullinan's accounts. Both parties agree the January 23 meeting between Lewis and Cullinan was tense and that Lewis made negative comments about Heartland Inns' policies. Lewis has presented no evidence showing that Heartland did not act on an honest belief when the decision was made to fire her for what Cullinan, Nosbisch, Orwig, and Minard perceived as hostility toward Heartland Inns management and policies.[17]

■ Lewis also questions a variety of the discretionary choices made by Cullinan and Heartland's human resources personnel, *i.e.*, she attacks their choice to discipline her with termination, their choice not to investigate her complaint that the re-interview requirement was illegal, the timing of the decision, and the collaborative approach adopted by the human resources personnel. In making each of these arguments Cullinan does not attack the actual veracity of Heartland's explanation, but

---

**16.** Lewis attempts to characterize Nosbisch's affidavit as stating that she made the termination decision "originally," but a closer reading of the affidavit reveals that Nosbisch was merely expressing her perspective on the reasons for the termination rather than describing a solitary and independent decision making process. *See* Pl.'s Statement of Additional Facts ¶ 95; Pl.'s App. at 37, 113–14.

**17.** Lewis also complains that Heartland's human resources personnel failed to inquire into the veracity of Cullinan's account of the January 23 meeting. A failure to verify, however,

does not fault the employer. In fact, the employer can be wholly wrong about its termination decision. So long as it makes the employment decision in good faith, the employment action is not pretext. *See Richey v. City of Independence,* 540 F.3d 779, 784 (8th Cir.2008) ("The normal rule in discrimination cases is that if an employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination.").

rather, asks the Court to second guess Heartland's business practices. Each of these arguments fail at the outset because "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999) (internal quotation and citation omitted). Additionally, the Court notes that several of these decisions indicate deliberation on the part of Heartland rather than pretext. The Court does not find it strange, much less an indication of pretext, that Cullinan waited to make the decision to fire Lewis until she had the opportunity to meet and discuss the matter with human resources personnel. Further, the Court finds nothing unusual in the correspondence between Nosbisch and Orwig, in which they collaborated in drafting Lewis's termination notice, and certainly nothing that indicates a false motivation on Heartland's part.

Lewis has failed to demonstrate a genuine issue of material fact that Heartland's reason for dismissing her was pretext for discrimination. Further, as discussed above, she has failed to bring forth evidence from which a reasonable jury could find that the real reason for her termination was gender bias.

### B. Retaliation

In her complaint, Lewis states that because she opposed the discriminatory acts of Heartland, Defendants terminated her employment. Defendants deny Lewis's claims and assert that Lewis cannot establish a prima facie case of retaliation because: (1) Lewis cannot establish that she opposed a statutorily prohibited activity, and (2) Lewis's opposition to the requested activity was not the reason for her termination.

As with her sex discrimination claim, Lewis presents no direct evidence that Heartland retaliated against her. Accordingly, the Court evaluates Lewis's claim under the familiar *McDonnell Douglas* burden-shifting analysis, adapted to the retaliation context. *See Bakhtiari v. Lutz*, 507 F.3d 1132, 1135–36 (8th Cir. 2007). Under this analysis, to establish a retaliation prima facie case, Lewis must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected conduct. *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir.2007).

> "Protected activity" in this context includes opposition to employment practices prohibited under Title VII; however, a plaintiff employee need not establish that the conduct he opposed was in fact prohibited under Title VII; rather [s]he need only demonstrate that [s]he had a "good faith, reasonable belief that the underlying challenged conduct violated [Title VII]."

*Bakhtiari*, 507 F.3d at 1136 (citing *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir.2000)). Thus, Lewis could succeed in her retaliation claim if she can demonstrate a good faith, reasonable belief that the second interview requirement violated Title VII. On the facts presented by Lewis, Lewis has failed to demonstrate such a reasonable, good faith belief. As an initial matter, both parties agree that an interview requirement is not illegal per se. Lewis thought the re-interview was illegal because she had been performing the job for a month, she believed Cullinan disapproved of her unfeminine manner of dress, and other transferred employees had not been required to interview. Lewis's claim to Title VII protection is her belief that the re-interview was merely a method by

which Heartland could move her back to the Night Auditor position based on Cullinan's dissatisfaction with Lewis's appearance. But, as discussed at length above, Title VII protects against sex discrimination only where the plaintiff is subjected to treatment that puts her sex at a disadvantage compared to persons of the opposite sex. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998 ("The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."); *see also Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1215 (8th Cir.1985) (holding that where an appearance standard is applied equally to males and females and is reasonably necessary for the job and regional area, Title VII does not protect an employee from adverse employment action because of her appearance). Because Title VII does not offer protection where there is no harm in comparison to the opposite gender, it is not a reasonable belief that Title VII would protect Lewis from an adverse employment action based solely on a disfavorable comparison of her manner of dress to a female stereotype. *See Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999) ("The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.") Because Lewis fails to demonstrate that she engaged in what might reasonably be considered protected activity, she has failed to establish a prima facie case of retaliation.[18]

Moreover, even if Lewis could establish that she engaged in protected conduct, her retaliation claims would fail because she cannot show that the legitimate, nondiscriminatory reason for her termination was pretext. Plaintiff has provided the same evidence of pretext with respect to both her sex discrimination and retaliation claim. The Court opts not to review again Lewis's evidence and arguments contending pretext in Heartland's stated reason for her dismissal. The Court simply notes that the analysis would mirror the discussion above in which the Court reviewed and ultimately rejected Lewis's contention that Heartland's legitimate, nondiscriminatory reason for her termination was pretext.

### IV.  CONCLUSION

For the reasons stated above, Heartland's Motion for Summary Judgment (Clerk's No. 14) is GRANTED.

IT IS SO ORDERED.

---

18. Because Lewis fails to demonstrate that she engaged in what might reasonably be considered protected activity, the Court does not address Defendants' second argument that Lewis's opposition to the interview was not the reason for her termination.