# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1654

_____

Willa Russell,                                   *
                                                 *
    Plaintiff - Appellant,               *
                                                 *    Appeal from the United States
v.                                               *    District Court for the
                                                 *    Western District of Missouri.
City of Kansas City, Missouri,                   *
                                                 *
    Defendant - Appellee.                *

_____

Submitted: January 13, 2005
Filed:  July 12, 2005

_____

Before LOKEN, Chief Judge, HANSEN and MORRIS SHEPPARD ARNOLD,
    Circuit Judges.

_____

LOKEN, Chief Judge.

After investigating a complaint by an African-American subordinate, the Kansas City Water Services Department demoted Willa Russell, a white female supervisor in the Pipeline Division, reduced her pay, and stripped her of all supervisory duties. Russell appealed to the City's Human Resources Board. After an evidentiary hearing, the Board concluded that Russell had engaged in misconduct, though it prospectively restored her pay and reduced her demotion. Russell then commenced this action, alleging intentional race and gender discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a), and the Missouri Human Rights Act,

Mo. Rev. Stat. § 213.055. The district court granted the City's motion for summary judgment, and Russell appeals. Reviewing the grant of summary judgment *de novo* and viewing the summary judgment record in the light most favorable to Russell, the non-moving party, we reverse. See Brunke v. Goodyear Tire & Rubber Co., 344 F.3d 819, 821 (8th Cir. 2003) (standard of review).

## I.

The dispute began in August 2000 when probationary employee Jennifer Love complained to the City that supervisor Russell had pushed Love and placed her in a headlock, had made several racially offensive comments, and had used offensive profanity in the workplace. Love stated that three other employees heard Russell's offensive comments and that Russell's two supervisors failed to take corrective action in response to Love's formal complaint.

Two Water Department employees investigated this complaint by interviewing Love, Russell, and two other Pipeline Division employees. The investigators concluded that Love's complaint of physical violence was unfounded but that Russell "had made repeated inappropriate comments based on race, ethnicity, and sexual orientation and . . . participated in or condoned activities that can only be termed as unprofessional, especially in light of her status as a supervisor." On September 1, acting on this report, the Director of Water Services sent Russell a letter removing her from the Pipeline Division offices "effective immediately," relieving her of all supervisory duties, and recommending "a five (5) day suspension without pay for your unprofessional behavior." The letter advised Russell that a predetermination hearing had been scheduled for September 12.

The next document in the sparse record on appeal is a January 3, 2001, letter from an EEO Investigator for the City's Human Resources Department to the Director of Water Services summarizing "the investigation that was conducted by the Equal

-2-

Employment Opportunity/Diversity Office in response to allegations of racial discrimination filed by Jennifer Love." The letter advised that, after interviewing Love, Russell, four office staff, and Russell's two supervisors, the Investigator concluded that "the following allegations [by Love] were corroborated":

      1. Ms. Russell did have a conversation with Ms. Love regarding her family picking cotton. However, it appears that both Ms. Love and Ms. Russell were laughing and joking during the conversation and that Ms. Love informed Ms. Russell the next day that she did not appreciate the comments made during the conversation.

      2. Ms. Russell did make a comment regarding Mexicans taking baths in fire hydrants while watching a Water Services video with other employees, including an employee of Hispanic origin.

      3. Ms. Russell regularly referred to a male employee (who is reported to be homosexual) as a "sissy pants."

The Investigator reported that the use of inappropriate language, ethnic slurs, and racial jokes in the office "is commonplace and tolerated" and recommended that Russell be demoted to a non-supervisory position for at least one year.

On January 4, the EEO Investigator sent Russell a letter advising her of the findings and the recommendation that Russell be disciplined. Though this letter was treated as the Department's statement of reasons at the subsequent due process hearing before the Personnel Board, the City did not include the document in the Joint Appendix on appeal. On January 5, Love received a letter from the Human Resources Department rejecting her complaint because "the use of slurs, racial epithets, and jokes based on race, ethnicity and sexual orientation is commonplace and tolerated." The City did not include this document in the Joint Appendix. On January 27, after a predetermination hearing, the hearing officer determined that there was sufficient

evidence to uphold the Director's recommended discipline. The City likewise did not include a copy of the hearing officer's decision in the Joint Appendix.

The Water Services Department demoted Russell and reduced her pay on March 26, 2001. Russell appealed to the Human Resources Department, and a hearing was held before its Personnel Board on June 15, 2001. Regarding the EEO Investigator's finding that Russell made a disparaging comment regarding Mexican children bathing in fire hydrants in the presence of an Hispanic employee, the employee in question, Rita Hernandez, testified that she never heard Russell make an inappropriate ethnic comment. Hernandez testified that Love and other employees including Russell frequently used profanity and racial slurs and that, in Hernandez's opinion, Russell had been singled out for punishment because she is white "in an office where all supervisors condone the types of things she's being accused of."

Regarding the EEO Investigator's finding that Russell regularly referred to a male employee as a "sissy pants," the employee in question, William Recar, testified that he is openly homosexual and has never been offended when Russell occasionally called him "sissy boy" (not "sissy pants"); that Russell's comments to Recar were always friendly and non-malicious; that black and white employees regularly used profanity and engaged in racial banter without appearing to be offended; that Russell's two supervisors knew of this verbal environment but took no action; and that he had seen at least five supervisors "do the same things that Willa Russell is being accused of and not be disciplined." Like Hernandez, Recar opined that Russell had been singled out for discipline because she is white.

After the hearing, the Board issued a written decision concluding that Russell "engaged in misconduct when, in the presence of, and often directed towards, her subordinate employees, she regularly used profanity, made inappropriate comments about race, and called a subordinate employee 'sissy pants' and that her actions are cause for disciplinary action." However, the Board reduced Russell's demotion from

two position levels to one and reinstated her prior salary without back pay. In addition, the Board expressed concern "with the fact that [Russell's] supervisors were not disciplined for failing to address [Russell's] behavior and with allegations of the pervasive use of profanity and demeaning language by both employees and supervisors." In response to this criticism, the Water Department issued reprimand letters one month later to Russell's two supervisors, a black male and a white male, but did not demote them or reduce their pay. This lawsuit followed.

## II.

As an initial matter, we agree with Russell that the district court committed an error of law in construing the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), as modifying the summary judgment standard applied by this court in employment discrimination cases. See Griffith v. City of Des Moines, 387 F.3d 733, 735-36 (8th Cir. 2004). Under that standard, as we have explained in Griffith and many other cases, an employee can survive the employer's motion for summary judgment in one of two ways. First, the employee can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." 387 F.3d at 736 (quotation omitted). Alternatively, if the employee lacks direct evidence of intentional discrimination, she may survive the employer's motion for summary judgment by "creating the requisite inference of unlawful discrimination" through the familiar three-step burden-shifting analysis originating in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To apply the standard in this case, it is essential to focus on the specific reasons Russell was demoted. The dispute began with Love's complaint that she had been physically assaulted and racially harassed by Russell. But viewing the evidence in the light most favorable to Russell, as we must, those complaints were completely

discredited by the end of the Personnel Board hearing. The EEO Investigator's only finding regarding Love was that Russell and Love engaged in light-hearted racial banter that Love complained about the next day. At the evidentiary hearing, Russell, Hernandez, and Recar all refuted Love's allegations, and the Board's post-hearing findings do not even mention the alleged misconduct against Love. Thus, for summary judgment purposes, Love's complaint of racial harassment, though it certainly warranted initial investigation by the City, is immaterial. Instead, the EEO Investigator found Russell guilty of derogatory and offensive comments to Hernandez and Recar and of tolerating a profane workplace where inappropriate racial jokes and banter were common. The Board upheld these findings and concluded they "are cause for disciplinary action."

Direct Evidence. At oral argument, Russell's attorney conceded that she does not have direct evidence of discrimination. The concession may be ill-advised. The City's primary stated reasons for disciplining Russell, as reflected in the Investigator's report and in the Board's decision, were her comment about Mexican children in Hernandez's presence and her calling the homosexual Recar "sissy pants."[1] On appeal, the City characterizes these as "derogatory comments based on

---

[1] Although the Personnel Board held an evidentiary due process hearing, it is well-settled that Russell is entitled to a trial *de novo* of her Title VII claim. See Univ. of Tenn. v. Elliott, 478 U.S. 788, 796 & n.5 (1986). Russell of course has no evidence that the members of the Board were guilty of intentional race or gender discrimination. But one issue is whether the Board served as a conduit or cat's paw for Water Department officials who were acting on an unlawful motive (at least in part) in initially imposing the discipline. Compare Kramer v. Logan County Sch. Dist. No. R-1, 157 F.3d 620, 624 (8th Cir. 1998), with Lacks v. Ferguson Reorg. Sch. Dist. R-2, 147 F.3d 718, 725 (8th Cir. 1998), cert. denied, 526 U.S. 1012 (1999). In this case, there is at least some evidence that the Board was a mere conduit, or perhaps an inattentive rubber stamp -- its decision repeated the EEO Investigator's error in reporting that Russell and others called Recar "sissy pants," rather than "sissy boy," after Recar pointedly corrected that mistake at the evidentiary hearing.

. . . ethnicity and sexual orientation." But at the hearing, both Hernandez and Recar testified, under oath, that Russell had never made comments they considered bigoted, derogatory, or offensive. Moreover, they opined *that Russell had been singled out for discipline on account of her race.* When two co-workers who are the alleged victims of misconduct deny that misconduct occurred and assert that the plaintiff is herself the victim of discrimination by the employer, that may well be direct evidence of discrimination sufficient to withstand the employer's motion for summary judgment. And if this testimony is not by itself sufficient, it is a powerful showing of the pretext needed to defeat summary judgment under <u>McDonnell Douglas</u>.

<u>The McDonnell Douglas Analysis.</u> The three-part <u>McDonnell Douglas</u> analysis begins with the plaintiff employee establishing a prima facie of discrimination, followed by the employer articulating a legitimate, nondiscriminatory reason for its adverse employment action. Neither of those steps is at issue here. Rather, as is usually the case, the question is whether Russell countered the City's non-discriminatory explanation with a sufficient showing that the City's stated reason is merely a pretext for unlawful intentional discrimination.

One common way to show pretext is with evidence that other similarly situated individuals who were not in the plaintiff's protected class engaged in the same conduct but were treated differently. <u>See</u> <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir. 1994). In a case of alleged discriminatory discipline, such as this, the plaintiff must produce evidence that the acts of other employees who were not disciplined or were disciplined less severely were of "comparable seriousness" to her infraction. <u>Lanear v. Safeway Grocery</u>, 843 F.2d 298, 301 (8th Cir. 1988) (quoting <u>McDonnell Douglas</u>, 411 U.S. at 804).

In the district court, Russell named twenty-eight Pipeline Division employees who regularly used profanity or told racist jokes and were not disciplined or demoted. The district court concluded that these "broad, general allegations" did not meet the

"rigorous" test that the compared employees be similarly situated in all material respects. In our view, the district court's general survey of this overgrown forest overlooked the two most important trees.

Viewing the summary judgment record most favorably to Russell, the evidence is that Love's initial complaint -- that Russell was guilty of *offensive* racial comments to Love, Hernandez, and Recar -- was either invalidated by the City's investigations or discredited by the hearing testimony of Hernandez and Recar. The remaining valid basis for Russell's demotion was that she tolerated as a supervisor, and indeed helped to foster, a workplace in which unacceptable profanity was rampant and inappropriate racial and ethnic joking was common. But as to that misconduct, there were two similarly situated employees: Russell's two immediate supervisors who tolerated the same workplace for years, who participated in the friendly but unacceptable verbal environment, and who reported to the same City officials who demoted Russell. Yet these two supervisors, one a black male and the other a white male, initially received no discipline at all and then were given a slap on the wrist after the Personnel Board had upheld a reduced but still severe punishment of Russell. When combined with Russell's other evidence casting doubt on the bona fides of the City's decision, particularly the above-described testimony of Hernandez and Recar, we conclude that the showing of pretext was more than enough to defeat the City's motion for summary judgment.

Conclusion. Title VII does not bar an employer, particularly a public employer, from taking decisive action to clean up a workplace where racial and ethnic jokes are common and the use of offensive profanity is rampant. That action may of course include relieving responsible supervisors of their supervisory duties. But when the only white female supervisor in the relevant work force presents strong evidence of double standards, selective enforcement of human resource policies, and scapegoating, as Willa Russell has in this case, it is for a jury to decide whether she is the victim of intentional race or gender discrimination.

The judgment of the district court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

_____