# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3860

_____

Brenna Lewis,       *
      *
      Plaintiff-Appellant,       *
      *
      v.       *
      *    Appeal from the United States
Heartland Inns of America, L.L.C.,       *    District Court for the
doing business as Heartland Inn       *    Southern District of Iowa.
Ankeny; Barbara Cullinan; Kristi       *
Nosbisch, individually and in their       *
corporate capacities,       *
      *
      Defendants-Appellees.       *

_____

Submitted: October 21, 2009
Filed: January 21, 2010

_____

Before LOKEN, Chief Judge, MURPHY and BYE, Circuit Judges.

_____

MURPHY, Circuit Judge.

Alleging that she lost a job she had done well, solely because of unlawful sex stereotyping, Brenna Lewis brought this action for sex discrimination and retaliation against her former employer Heartland Inns of America, its Director of Operations and its Human Resource Director (collectively Heartland) based on Title VII and state law. The district court granted summary judgment to Heartland. We reverse and remand.

I.

A summary judgment must be reviewed de novo, "viewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all inferences that may reasonably be drawn." Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 605 (8th Cir. 2009) (quotation omitted). The factual background here is therefore set out with that standard in mind.

Heartland Inns operates a group of hotels, primarily in Iowa. Brenna Lewis began work for Heartland in July 2005 and successfully filled several positions for the chain for a year and a half before the actions at issue here. She started as the night auditor at Heartland's Waterloo Crossroads location; at that job she worked at the front desk from 11:00 p.m. to 7:00 a.m. There were also two other shifts for "guest service representatives": the A shift from 7:00 a.m. to 3:00 p.m. and the B shift from 3:00 p.m. to 11:00 p.m. Lewis' manager at Waterloo Crossroads, Linda Gowdy, testified that Lewis "did her job well" and that she had requested a pay raise for her. Heartland recorded two merit based pay raises for Lewis. The record also indicates that Gowdy received a customer comment praising Lewis.

On or about December 7, 2006, Lewis began working various part time front desk shifts at Heartland Inns located near Des Moines, including at Ankeny and Altoona. At both locations she was valued by her direct supervisors. Her manager at the Altoona hotel, Jennifer Headington, testified that Lewis "made a good impression[.]" She offered her a full time night auditor position after receiving telephone permission from Barbara Cullinan, Heartland's Director of Operations. Lori Stifel, Lewis' manager at the Ankeny hotel, testified in her deposition that Lewis did a "great job" in Ankeny, "fit into the [front desk] position really well" and was well liked by customers. Stifel received permission over the phone from Cullinan on December 15 to offer Lewis a full time A shift position. Neither Headington nor Stifel conducted an interview of Lewis before extending their offers, and the record

does not reflect that Cullinan ever told them a subsequent interview would be necessary. Lewis accepted the offer for the A shift at Ankeny and began training with her predecessor, Morgan Hammer. At the end of December 2006 Lewis took over the job.

Lewis' positive experience at Heartland changed only after Barbara Cullinan saw her working at the Ankeny desk. As the Director of Operations, Cullinan had responsibility for personnel decisions and reported directly to the general partner of Heartland. She had approved the hiring of Lewis for the Ankeny A shift after receiving Stifel's positive recommendation. After seeing Lewis, however, Cullinan told Stifel that she was not sure Lewis was a "good fit" for the front desk. Cullinan called Stifel a few days later and again raised the subject of Lewis' appearance. Lewis describes her own appearance as "slightly more masculine," and Stifel has characterized it as "an Ellen DeGeneres kind of look." Lewis prefers to wear loose fitting clothing, including men's button down shirts and slacks. She avoids makeup and wore her hair short at the time. Lewis has been mistaken for a male and referred to as "tomboyish."

Cullinan told Stifel that Heartland "took two steps back" when Lewis replaced Morgan Hammer who has been described as dressing in a more stereotypical feminine manner. As Cullinan expressed it, Lewis lacked the "Midwestern girl look." Cullinan was heard to boast about the appearance of women staff members and had indicated that Heartland staff should be "pretty," a quality she considered especially important for women working at the front desk. Cullinan also had advised a hotel manager not to hire a particular applicant because she was not pretty enough. The front desk job description in Heartland's personnel manual does not mention appearance. It states

-3-

only that a guest service representative "[c]reates a warm, inviting atmosphere" and performs tasks such as relaying information and receiving reservations.[1]

In her conversation with Stifel about Brenna Lewis, Cullinan ordered Stifel to move Lewis back to the overnight shift. Stifel refused because Lewis had been doing "a phenomenal job at the front desk[.]" The following week, on January 9, 2007, Cullinan insisted that Lori Stifel resign. Around this time, Heartland informed its general managers that hiring for the front desk position would require a second interview. Video equipment was also purchased to enable Cullinan or Kristi Nosbisch, Heartland's Human Resource Director, to see an applicant before extending any offer. When Lewis' former manager at Altoona, Jennifer Headington, raised a question about the new arrangements, Cullinan answered that "[h]otels have to have a certain personification and appearance."

Cullinan met with Brenna Lewis on January 23, 2007. At this point Lewis had held the front desk job for nearly a month after Cullinan's initial approval of her hire for the position. The record contains no evidence of any customer dissatisfaction with Lewis or her service. Nevertheless, Cullinan told Lewis at the meeting that she would need a second interview in order to "confirm/endorse" her A shift position. Lewis was aware from Lori Stifel of what had been said about her appearance, and she protested that other staff members had not been required to have second interviews for the job. Lewis told Cullinan that she believed a second interview was being required only

---

[1]Heartland has not tried to suggest that the "Midwestern girl look" or prettiness were bona fide occupational qualifications for its clerk job, as might conceivably be the case with the cheerleaders referenced in the dissent. Such an affirmative defense requires proof that the qualification is "necessary to the normal operation of that particular business or enterprise[.]" 42 U.S.C. § 2000e-2(e)(1). For example, "female sex appeal" is not a bona fide occupational qualification for flight attendants and ticket agents. See Wilson v. Southwest Airlines Co., 517 F.Supp. 292 (N.D.Tex. 1981).

because she lacked the "Midwestern girl look." She questioned whether the interview was lawful, and she cried throughout the meeting.

Cullinan wanted to know who had told Lewis about the comment and asked whether it was Lori Stifel. Thereafter Cullinan talked about the need for new managers when revenue is down like in Ankeny, where Stifel was the manager. Lewis responded that recent policy changes by Heartland, including bans on smoking and on pets, might explain the loss in revenue. Cullinan then encouraged Lewis to share more of her views about the new policies and took notes on what she said. Three days later, Lewis was fired.

Lewis does not challenge Heartland's official dress code, which imposes comparable standards of professional appearance on male and female staff members, and her termination letter did not cite any violation of its dress code. The theory of her case is that the evidence shows Heartland enforced a de facto requirement that a female employee conform to gender stereotypes in order to work the A shift. There was no such requirement in the company's written policies.

In its termination letter to Lewis, Heartland asserted that she had "thwart[ed] the proposed interview procedure" and exhibited "host[ility] toward Heartland's most recent policies[.]" Lewis denies those charges and denies that those were the real reasons for her discharge. There were no customer complaints about Lewis' performance as a desk clerk. Nor had there been any disciplinary action against her before she was fired. Lewis asserts that Heartland terminated her for not conforming to sex stereotypes and contends that this conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Iowa Civil Rights Act of 1965 (ICRA), Iowa Code § 216.1 et seq.

II.

Heartland was not entitled to prevail on summary judgment unless it showed that plaintiff Brenna Lewis had not produced direct or circumstantial evidence which could reasonably support an inference of discrimination. Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of . . . sex*[.]" 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Discrimination occurs when sex "was a motivating factor for any employment practice, even though other factors also motivated the practice." Id. at § 2000e-2(m). Lewis agrees with Heartland that the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to analyze the viability of Heartland's summary judgment motion.

To make a prima facie case under the McDonnell Douglas framework, Lewis had to show that "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." Bearden v. Int'l Paper Co., 529 F.3d 828, 831 (8th Cir. 2008). Such a showing creates a presumption of unlawful discrimination, requiring Heartland to produce a legitimate nondiscriminatory reason for its employment action. Id. at 831-32. The burden then returns to Lewis to prove that Heartland's proffered reason for firing her is pretextual. Id. at 832. The parties agree that Lewis' ICRA and federal claims are analytically indistinguishable. See Quick v. Donaldson Co., 90 F.3d 1372, 1380 (8th Cir. 1996).

Among the authorities relied on by Lewis is Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), where the Supreme Court decided that sex stereotyping can violate Title VII when it influences employment decisions. Well before Price Waterhouse, however, courts had found sex specific impositions on women in customer service jobs such as this one illegal. Violations of Title VII occurred where a female lobby

attendant was terminated for refusing to wear a sexually provocative uniform, see EEOC v. Sage Realty Corp., 507 F.Supp. 599, 607-608 (S.D.N.Y. 1981), where only women employees were compelled to wear uniforms, see Carroll v. Talman Fed. Sav. & Loan Ass'n of Chic., 604 F.2d 1028 (7th Cir. 1979), and where only female flight attendants were required to wear contact lenses instead of glasses, see Laffey v. Northwest Airlines, Inc., 366 F.Supp. 763, 790 (D.D.C. 1973), aff'd in part, vacated and remanded in part on other grounds, 567 F.2d 429 (D.C. Cir. 1976). In a more recent example in the Ninth Circuit, an airline policy requiring female flight attendants to be comparatively thinner than male attendants was found discriminatory. See Frank v. United Airlines, Inc., 216 F.3d 845, 855 (9th Cir. 2000).

In Price Waterhouse, where a female senior manager was denied partnership, partners involved in their decision had referred to her as "'macho'" and in need of "'a course at charm school[.]'" 490 U.S. at 235. She was advised that to become a partner she should "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" Id. Such stereotypical attitudes violate Title VII if they lead to an adverse employment decision. Id. at 251; id. at 259 (White, J., concurring); id. at 272-73 (O'Connor, J., concurring). The Price Waterhouse plurality's understanding that an employer might escape liability by showing that it would have made the same decision even without a discriminatory motive is no longer permissible because Congress provided otherwise, see 42 U.S.C. § 2000e-2(m), but the Court's conclusion that Title VII prohibits sex stereotyping endures. Like the plaintiff in Price Waterhouse, Lewis alleges that her employer found her unsuited for her job not because of her qualifications or her performance on the job, but because her appearance did not comport with its preferred feminine stereotype.

Other circuits have upheld Title VII claims based on sex stereotyping subsequent to Price Waterhouse. See, e.g., Chadwick v. WellPoint, Inc., 561 F.3d 38 (1st Cir. 2009); Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107 (2d

Cir. 2004); <u>Smith v. City of Salem, Ohio</u>, 378 F.3d 566 (6th Cir. 2004); <u>Nichols v. Azteca Rest. Enters., Inc.</u>, 256 F.3d 864 (9th Cir. 2001). These cases are instructive here despite the dissent's unexplained charge that similar reliance on <u>Price Waterhouse</u> is "unwarranted[.]"

The Sixth Circuit's <u>Smith</u> case concerned a fire fighter who was born male but subsequently came to identify as a woman. 378 F.3d at 568. When he began "to express a more feminine appearance" at work, he was told by colleagues that he was not "masculine enough[.]" <u>Id.</u> at 572. His superiors then "devise[d] a plan" to terminate him, including an order that he submit to multiple psychological evaluations. <u>Id.</u> at 568-69. If he did not consent, "they could terminate Smith's employment on the ground of insubordination." <u>Id.</u> at 569. Lewis similarly alleges that Heartland imposed a second interview and then used her objection to it against her when its real reason for terminating her was because she lacked the "Midwestern girl look" and was not pretty enough to satisfy Cullinan. As the Sixth Circuit concluded in <u>Smith</u>, an adverse employment decision based on "gender non-conforming behavior and appearance" is impermissible under <u>Price Waterhouse</u>. <u>Id.</u> at 571-72.

Likewise, in <u>Chadwick</u>, the First Circuit found a decisionmaker's explanation why the plaintiff had not received a promotion evidence that the decision was motivated by an illegal sex stereotype that women would prioritize child care responsibilities over paid employment. <u>Chadwick</u>, 561 F.3d at 42 (with four young children she had "'too much on her plate'"); <u>see also</u> <u>id.</u> at 44. The Second Circuit similarly concluded in <u>Back</u> that the statement that a mother who received tenure "'would not show the same level of commitment [she] had shown because [she] had little ones at home'" showed discriminatory intent in the tenure decision. <u>Back</u>, 365 F.3d at 120. The Seventh Circuit found remarks characterizing conduct of a woman employee as "'you're being a blond[e] again today'" probative of sex discrimination in <u>Lust v. Sealy, Inc.</u>, 383 F.3d 580, 583 (7th Cir. 2004). Cullinan's criticism of Lewis

for lack of "prettiness" and the "Midwestern girl look" before terminating her may also be found by a reasonable factfinder to be evidence of wrongful sex stereotyping.

The district court recognized that sex stereotyping comments may be evidence of discrimination. Lewis v. Heartland Inns of Am., LLC, 585 F.Supp.2d 1046, 1059 (S.D.Iowa 2008). The focus of its decision was the mistaken view that a Title VII plaintiff must produce evidence that she was treated differently than similarly situated males. Our court has explicitly rejected that premise. Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1022 (8th Cir. 1998). Other circuits have reached the same conclusion. See, e.g., Back, 365 F.3d at 121; Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 (4th Cir. 2003).

The required prima facie showing is a "flexible evidentiary standard" that was "never intended to be rigid, mechanized, or ritualistic." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quotation omitted); see also McDonnell Douglas, 411 U.S. at 802 n. 13. Courts "consistently emphasize[] that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." Back, 365 F.3d at 121( emphasis in original; quotation omitted). As the Supreme Court explained in Connecticut v. Teal, 457 U.S. 440, 453-54 (1982), "[t]he principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole." The district court's error was in requiring Lewis to offer evidence that similarly situated men were treated differently.

If comparative evidence is relied on by a plaintiff to support the final element of her prima facie case, courts of course require such proof and so characterize the fourth element. See, e.g., Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008); Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 631 (8th Cir. 2005). Comparative evidence is certainly not the "exclusive means by which a plaintiff may establish an inference of discrimination[,]" however. Young, 152 F.3d at 1022.

Plaintiffs may satisfy the fourth element through other types of evidence. See, e.g., Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1127-29 (8th Cir. 2008); Simmons v. New Pub. Sch. Dist. No. Eight, 251 F.3d 1210, 1214 (8th Cir. 2001); Landon v. Northwest Airlines, Inc., 72 F.3d 620, 624 (8th Cir. 1995); see also Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) ("[E]vidence of pretext-normally considered only at step three of the McDonnell Douglas analysis-[can also] satisf[y] this aspect of the plaintiff's prima facie case burden.").[2] Moreover, "remarks of the employer that reflect a discriminatory attitude" are often sufficiently strong evidence to avoid the McDonnell Douglas framework completely, as in the example of Roberts, 528 F.3d at 1128 (quotation omitted); see also Griffith, 387 F.3d at 736. The touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination.

The Supreme Court has stated that "[t]he critical issue" in a sex discrimination case is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring). Neither these cases nor other Supreme Court precedents compel a woman alleging sex discrimination to prove that men were not subjected to the same challenged discriminatory conduct or to show that the discrimination affected anyone other than herself. As the Sixth Circuit succinctly stated, "[a]fter Price Waterhouse, an employer who discriminates against women because, for instance, they do not wear dresses or

---

[2]A district court case on which Heartland heavily relies actually supports the proposition that a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways. See Schoonover v. Schneider Nat'l Carriers, Inc., 492 F.Supp.2d 1103, 1137-38 (S.D.Iowa 2007) (different treatment of similarly situated employees "[o]ne way" to prove the fourth element but biased comments by a decisionmaker also sufficient).

makeup, is engaging in sex discrimination *because the discrimination would not occur but for the victim's sex*." Smith, 378 F.3d at 574 (emphasis added).

Oncale illustrates how an employee may prove an adverse employment action because of sex without evidence that employees of the opposite sex were treated differently. Oncale was part of an eight man ship crew. Oncale, 523 U.S. at 77. Oncale could not show any female crew were treated differently since there were none. Evidence that he had been sexually harassed was nevertheless sufficient to support his Title VII claim because the harassment *was because of his sex*. As the Court explained, "com-parative evidence about how [an] alleged harasser treated members of both sexes" is only one "evidentiary route" to prove discrimination, but a harasser's "sex-specific and derogatory terms" can do the same. Id. at 80-81; see also Quick, 90 F.3d at 1378-79. As in Oncale, Lewis need only offer evidence that *she* was discriminated against because of her sex. The question is whether Cullinan's requirements that Lewis be "pretty" and have the "Midwestern girl look" were because she is a woman. A reasonable factfinder could find that they were since the terms by their nature apply only to women.

We recognize that "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." Price Waterhouse, 490 U.S. at 251. Lewis met this burden at the summary judgment stage. She provided evidence that the comments she cites were not "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself[.]" Simmons, 251 F.3d at 1214-15 (quotations omitted).

Cullinan was a primary decisionmaker with authority to hire and fire employees. While several individuals also took part in the decision to terminate Lewis, they relied on Cullinan's description of her January 23, 2007 conversation with

Lewis. Cullinan consistently indicated that female front desk workers must be "pretty," and she criticized Lewis' lack of the "Midwestern girl look" in the same conversation in which she ordered Stifel to move Lewis back to the night audit. Cullinan authorized Stifel to hire Lewis over the phone, but demanded a "confirm/endorse" interview once she saw Lewis' "tomboyish" appearance. She demanded Stifel's resignation after she refused to remove Lewis from her position.

Evidence that Heartland's reason for the termination were pretextual include the fact that Lewis had a history of good performance at Heartland. She had no prior disciplinary record and had received two merit based pay raises. The two individuals who supervised her during the majority of her employment at Heartland both stated that they had no problem with her appearance, and at least one customer had never seen customer service like that Lewis had provided. On this record, a factfinder could infer a discriminatory motive in Heartland's actions to remove Lewis.

In addition to establishing a prima facie case of discrimination, Lewis has also shown a genuine factual dispute about whether Heartland's legitimate nondiscriminatory reason for her termination was pretextual. See Griffith, 387 F.3d at 735 (emphasis in original) ("At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action."). Evidence that similarly situated employees outside Lewis' class were treated differently is only "[o]ne common way to show pretext[.]" Russell v. City of Kansas City, Missouri, 414 F.3d 863, 868 (8th Cir. 2005). Lewis may rely on other evidence to establish a material factual dispute on pretext. See Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120-21 (8th Cir. 2006).

On the record here, a reasonable factfinder could disbelieve Heartland's proffered reason for terminating Lewis. Heartland asserts that it fired Lewis because of the January 23 meeting when Cullinan informed her that she would need to submit

to a second interview. Lewis and Cullinan, the only two individuals in the room, portray the encounter in starkly different terms. On summary judgment we must construe the conversation in the light most favorable to Lewis, however. Lewis denies that she expressed hostility to Heartland's policies or spoke in a disrespectful way or took an argumentative stance or refused to participate in a second interview. It is also relevant that the meeting occurred after Cullinan had given Stifel the understanding that "[Lewis'] appearance . . . was not what [she] wanted on the front desk" and after Stifel had shared that discussion with Lewis.

Shortly after Cullinan's conversation with Stifel about Lewis' appearance, Heartland procured video equipment so that Cullinan or Nosbisch could inspect a front desk applicant's look before any hiring. Heartland's termination letter to Lewis only relied on the January 23 meeting she had with Cullinan. Only later did Heartland allege poor job performance would justify her termination. Lewis asserts further that Heartland did not follow its own written termination procedure, which includes assessing the employee's previous disciplinary record (Lewis had none) and conducting an investigation before making the termination decision. Kristi Nosbisch, Heartland's equal employment officer responsible for directing investigations of employment discrimination, knew that Lewis had complained that Cullinan's requirements were illegal, but she nonetheless relied on Cullinan's account of their meeting without asking Lewis for her own.

At this stage of the case, the question is not whether Lewis will prevail on her claim but rather whether she has offered sufficient evidence from which a reasonable factfinder could find that she was discriminated against because of her sex. We conclude that she has, for "an employer who discriminates against women because . . . they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex." Smith, 378 F.3d at 574. Companies may not base employment decisions for jobs such as Lewis' on sex stereotypes, just as Southwest Airlines could not lawfully hire as flight attendants only

-13-

young, attractive, "charming" women "dressed in high boots and hot-pants[.]" Wilson, 517 F.Supp. at 294, 295 (quotation omitted).  As the Supreme Court stated, "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group[.]"  Price Waterhouse, 490 U.S. at 251.

## III.

We turn next to Lewis' retaliation claim.  Title VII prohibits employers from retaliating against employees who oppose discriminatory practices.  42 U.S.C. § 2000e-3(a).  The burden shifting McDonnell Douglas analytical framework applies to this inquiry as well, beginning with the three elements of a prima facie case of retaliation, whether: (1)the plaintiff engaged in protected conduct, including opposition to an action prohibited by Title VII; (2) she was subjected to an adverse employment action, and (3) there is a "causal nexus between the protected conduct and the adverse action."  Wallace, 442 F.3d at 1119.

In making out a prima facie retaliation claim, Lewis need not prove the merits of the underlying claim of sex discrimination.  She can establish protected conduct "as long as [she] had a reasonable, good faith belief that there were grounds for a claim of discrimination[.]"  Id. at 1118.  Lewis went into the January 23 meeting with Cullinan after learning about the "Midwestern girl look" comment.  Lewis had already held her job for nearly a month and understood that other transferred employees in her situation had not been required to submit to a second interview.  She observed Cullinan grow defensive after she asked her about the "Midwestern girl look" comment.

Heartland argues that its official policy dictated a second interview, but Lewis has raised a genuine fact issue about whether Heartland imposed second interviews in similar circumstances before January 2007 and whether Heartland began doing so

in relation to Cullinan's interaction with Lewis. Heartland suggests that Lewis' comments during the January 23 meeting did not actually oppose any unlawful practice. Cullinan testified, however, that Lewis had "emphatically stated that she thought it was illegal for us to ask her to interview, and illegal for us to schedule her to another shift" and that Lewis said she thought the interview demand was because of her appearance. These statements cannot reasonably be characterized as anything other than opposition to illegal action.

No one questions that Lewis was subjected to an adverse employment action, and there is ample record evidence to support a causal nexus between that and Lewis' protests at the January 23 meeting. Lewis received the termination notice a mere three days after the disputed conversation, and Heartland cited her objection to the second interview in her termination notice. The evidence of pretext already discussed applies with equal force in evaluating whether Lewis has made out a prima facie retaliation claim.

IV.

In sum, we conclude that Lewis has presented sufficient evidence to make out a prima facie case on her claims for sex discrimination and retaliation and a sufficient showing at this stage that Heartland's proffered reason for her termination was pretextual. See Roberts, 528 F.3d at 1129. Accordingly, we reverse the judgment of the district court and remand for further proceedings.

LOKEN, Chief Judge, dissenting.

I respectfully dissent. Apparently, the majority would hold that an employer violates Title VII if it declines to hire a female cheerleader because she is not pretty enough, or a male fashion model because he is not handsome enough, unless the employer proves the affirmative defense that physical appearance is a bona fide

-15-

occupational qualification.  Like the district court, I conclude this is an unwarranted misreading of the plurality and concurring opinions in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  In my view, an employer's decision to hire or fire based on a person's physical appearance is not discrimination "because of . . . sex" unless it is a pretext for disadvantaging women candidates, as the trial court found in Price Waterhouse v. Hopkins.  As there is no evidence of that here, I would affirm for the reasons stated in the district court's persuasive and thorough Order on Motion for Summary Judgment dated November 13, 2008.

_____