# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1797

_____

Donna Floyd-Gimon

*Plaintiff - Appellant*

v.

University of Arkansas for Medical Sciences, by and through The Board of Trustees of The University of Arkansas; John Ed Anthony, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Carl Johnson, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Jane Rogers, in her official capacity as a member of the Board of Trustees of the University of Arkansas; Sam Hilburn, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Mike Akin, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Jim Von Gremp, in his official capacity as a member of the Board of Trustees of the University of Arkansas; John Tyson, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Ben Hyneman, in his official capacity as a member of the Board of Trustees of the University of Arkansas; David Pryor, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Mark Waldrip, in his official capacity as a member of the Board of Trustees of the University of Arkansas; Mary Helen Forest, in her personal capacity; Charles White, in his personal capacity; R.T. Fendley, in his personal capacity; Richard Pierson, in his official and personal capacity

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 16, 2013
Filed: June 18, 2013
_____

Before RILEY, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.
_____

RILEY, Chief Judge.

On May 9, 2008, the University of Arkansas for Medical Sciences (UAMS) terminated Donna Floyd-Gimon's employment based on gross misconduct. Floyd-Gimon sued UAMS, through its Board of Trustees; the trustees in their official capacity; Mary Helen Forrest, Charles White, and R.T. Fendley, each in their personal capacity; and Richard Pierson, in his official and personal capacities (collectively, defendants) under 42 U.S.C. § 1983, alleging, as relevant here, due process violations and gender discrimination in violation of Floyd-Gimon's equal protection rights.[1] Floyd-Gimon appeals from the district court's[2] adverse grant of summary judgment. Having appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND
### A.    Facts

Floyd-Gimon was one of two liver transplant coordinators at UAMS. Her immediate supervisors were Sue Weeks and Ann Butts. Floyd-Gimon's duties included monitoring and maintaining patients' records and entering their health information into the United Network for Organ Sharing (UNOS) database. Failing to enter lab results properly could adversely affect patients' eligibility for a transplant.

_____

[1]Floyd-Gimon also brought state law claims that are not at issue in this appeal.

[2]The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

While auditing UAMS's liver transplant program in 2007 and 2008, UNOS more than once requested documentation of data entries, including several entries made by Floyd-Gimon. Floyd-Gimon and Sue Belcher, the other liver transplant coordinator, agreed Belcher would compile the source documents for UAMS's audit response.

On April 18, 2008, Weeks called Floyd-Gimon to inform her UNOS had questions about the audit, and Weeks asked Floyd-Gimon "about specific lab results and other documents for certain patients." The same day, Weeks copied Floyd-Gimon on an email in which Weeks asked Belcher to find certain patient records missing from the audit response. On April 19, 2008, Butts included Floyd-Gimon on a second email sent to Belcher, discussing the missing records for several of the patients mentioned in Weeks' email. In total, Weeks' and Butts' emails mentioned nine or ten patients by name.

Weeks and Butts reviewed the audit response, which Belcher gave Weeks on April 24, 2008. Weeks reported her investigation of a suspicious-looking record in the audit response led to the discovery of physically "cut and pasted" records in shred bins. Several of the altered records concerned two of Floyd-Gimon's patients. Butts told her supervisor, Fendley, of the alterations, and Weeks told Forrest, who, as UAMS's Chief Nursing Officer (CNO), "is responsible for overseeing nursing practice quality at UAMS Medical Center and compliance with [Arkansas State Board of Nursing (ASBN)] rules and regulations."

On April 25, 2008, Floyd-Gimon, with Belcher, met with Fendley, Butts, and Weeks and was told "discrepancies in the records and . . . some actual alterations of records were found," including some records that had been "cut and pasted." Floyd-Gimon denied involvement. She was placed on administrative leave the same day.

-3-

Jane Hohn and Paula Alonso, compliance officers for UAMS, began investigating who altered the records. At a meeting on April 29, 2008, "Hohn and Alonso asked [Floyd-Gimon] about manipulation of documents, if she was involved in the audit, who worked on it, who had access to her area, and who might have been there." They also asked Floyd-Gimon whether she had falsified or altered documents, about "the system [Floyd-Gimon] used for documents," and "the policy for keeping source documents." Floyd-Gimon denied altering or falsifying records, but stated she "might have" "pull[ed] up a lab report for" Belcher, if Belcher had asked. Floyd-Gimon claims she repeatedly asked to see the allegedly altered documents, but was not permitted to do so at any point in the investigation.

Hohn and Alonso prepared a compliance report, summarizing some of the problems revealed by their investigation. The report detailed instances of inaccurately reported information (including "cut and pasted" records) and "unsupported/undocumented information reported to UNOS." Some of the altered records Hohn and Alonso identified related to four patients mentioned in Weeks' April 18, 2008 email. Butts also mentioned one of these patients in her April 19, 2008 email.

Floyd-Gimon met with Fendley, Butts, and Dr. Nick Lang on May 9, 2008. At this meeting, Floyd-Gimon "was informed that UAMS determined she had altered medical records for the response to the April 18 audit request." UAMS officially terminated Floyd-Gimon at the end of the meeting. Fendley's supervisor, Richard Pierson, approved the termination decision. Floyd-Gimon received a termination letter stating she was being terminated for gross misconduct, specifically because of "multiple instances" of Floyd-Gimon both "entering incorrect data into the [UNOS] data base" and altering patient records.[3] Floyd-Gimon signed the termination letter,

---

[3]The UAMS employee handbook provides employment with UAMS is at-will and "gross misconduct" will lead to "[i]mmediate dismissal."

checking a box that indicated she had read, but disagreed with, the explanation of her termination.

On May 16, 2008, Floyd-Gimon filed a grievance with Charles White, the UAMS Assistant Vice Chancellor for Employee Relations, complaining she "was never given the specific details surrounding [her] termination, nor allowed to respond to the allegations[, and] even the 'general' statements made to [her] do not constitute 'gross misconduct' as defined in UAMS policies." Floyd-Gimon asked to review the allegedly altered documents, learn "of the specific conduct" of which she was accused, and "be given an opportunity to respond to these allegations to some review panel to determine what discipline, if any, is appropriate." She also said she "[u]ltimately . . . would like to be reinstated, with back pay."

UAMS's grievance procedure provides that the "Chancellor (or his/her designee) . . . may elect to refer the matter to a grievance committee" composed of three UAMS staff members, to review the facts and make a recommendation. The record does not indicate whether such committees may or must conduct any sort of hearing. White, who was not involved in the termination decision, administered the grievance process, and inferentially, was acting as the Chancellor's designee. White either reviewed Floyd-Gimon's grievance himself or sent the grievance to Fendley and Pierson—a disputed fact—but did not refer Floyd-Gimon's grievance to any grievance committee.

At White's request, Fendley and Pierson wrote a memorandum stating their belief Floyd-Gimon's termination was justified because "it [was] clear that" Floyd-Gimon altered patient records, apparently due to "sloppiness . . . and, when discovered," Floyd-Gimon committed "numerous acts of record alteration in order to cover up . . . inadequate record maintenance." The memorandum characterized Floyd-Gimon's behavior as "gross misconduct potentially affecting not only patients' lives, but the ongoing viability of the UAMS Liver Transplant Program." The

-5-

memorandum described three specific alterations as examples. On June 6, 2008, White denied Floyd-Gimon's grievance.

On May 22, 2008, Forrest notified the ASBN by letter that UAMS terminated Floyd-Gimon's employment because Floyd-Gimon "intentionally alter[ed] patient medical records to produce source documents needed to respond to a routine care related audit." In response, ASBN sent Floyd-Gimon a "Letter of Warning" stating, "While employed at UAMS you failed to accurately document . . . medical record laboratory and diagnostic findings."

## B.    Procedural History

Floyd-Gimon sued defendants under 42 U.S.C. § 1983 in the district court on June 15, 2010, alleging defendants violated the Fourteenth Amendment by depriving Floyd-Gimon of (1) a property interest in her employment without due process; (2) a liberty interest in her reputation without due process;[4] and (3) equal protection by terminating Floyd-Gimon because of her gender. On March 16, 2012, the district court granted defendants' motion for summary judgment, finding no evidence Floyd-Gimon either was deprived of any constitutionally protected property or liberty interest or was terminated because of her gender. The district court dismissed Floyd-Gimon's claims for monetary damages against UAMS and the individual defendants acting in their official capacities, holding the Eleventh Amendment bars these claims. Floyd-Gimon appeals the district court's holdings concerning her claims against all

---

[4]Although Floyd-Gimon initially characterized her interest in her reputation as a property interest, the district court and both parties later characterized it as an alleged liberty interest, so we will do the same. Cf. Am. Family Mut. Ins. Co. v. Hollander, 705 F.3d 339, 348 (8th Cir. 2013) ("[A] party will be deemed to have acquiesced in trying an unpleaded issue when the issue is 'not inconsistent with' the position taken by the . . . party earlier in the proceedings." (quoting Baker v. John Morrell & Co., 382 F.3d 816, 831 (8th Cir. 2004))); see also, e.g., Rush v. Perryman, 579 F.3d 908, 912-13 (8th Cir. 2009) (framing a public employee's reputational interest as a liberty interest).

defendants for injunctive relief and her claims for monetary damages against the individual defendants in their personal capacities.

## II.    DISCUSSION

Defendants are entitled to summary judgment if "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Floyd-Gimon.  See Hill v. City of Pine Bluff, Ark., 696 F.3d 709, 711 (8th Cir. 2012).

### A.     Due Process Property Interest Claim

To prevail on her due process property interest claim, Floyd-Gimon must prove defendants deprived her of "a property right in continued employment" without due process.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).  Whether Floyd-Gimon had such a right depends on state law.  See Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 601 (8th Cir. 2003).  The district court determined Floyd-Gimon did not have a property interest in her employment because employment in Arkansas is at-will and UAMS did not create any expectation of continued employment.

Assuming Floyd-Gimon had a property interest in her continued employment, her due process claim fails because she received all of the process she was due.  "A public employee with a protected property interest in continued employment receives sufficient due process if he [or she] receives notice, an opportunity to respond to the charges before his [or her] termination, and post-termination administrative review." Young v. City of St. Charles, Mo., 244 F.3d 623, 627 (8th Cir. 2001).  A pre-deprivation hearing need only provide the employee with "oral or written notice of the charges against him [or her], an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story."  Loudermill, 470 U.S. at 546. "[T]he pretermination 'hearing,' though necessary, need not be elaborate."  Id. at 545.

Floyd-Gimon received pre-deprivation process through the meetings with her supervisors and post-deprivation process through UAMS's grievance procedure. She attended three meetings with supervisors before her termination when she repeatedly was told that she was accused of altering records, some of which were "cut and pasted." The supervisors asked Floyd-Gimon whether she was involved in any such misconduct and about the treatment of records. She received a chance to respond to the allegations. Floyd-Gimon received "notice [and explanation] of the charges against [her] . . . and an opportunity to present [her] side of the story" before being terminated. Id.

Floyd-Gimon's attorney acknowledged as much at oral argument, but maintained Floyd-Gimon should have been shown the allegedly altered records. See id. (requiring employers to explain the evidence against employees before terminating them). UAMS terminated Floyd-Gimon for altering "medical records for the response to the April 18 audit request." On April 18, 2008, Weeks informed Floyd-Gimon by email of problems with specific patients' records, listing nine or ten patients by name. Among those listed patients were four whose records Hohn and Alonso later determined had been altered. The same day, Weeks also spoke with Floyd-Gimon on the phone and discussed specific patient records needed for the audit response, like lab results. Butts' April 19 email, which Floyd-Gimon received, also mentioned records were missing for several of these patients. These communications, combined with the later reference to the April 18 audit request, gave Floyd-Gimon sufficient notice of the records supporting termination. Although UAMS officials could have been more forthcoming in explaining the allegations of wrongdoing, they were not required to do so, and their alleged failure to provide Floyd-Gimon with specific examples of altered records at the time of the charges, in this case, does not rise to the level of a due process violation. The district court properly granted summary judgment to the defendants on this claim.

**B.      Due Process Liberty Interest Claim**

Floyd-Gimon asserts defendants deprived her of a liberty interest in her reputation without due process, in violation of the Fourteenth Amendment, by reporting misconduct to the ASBN without first giving her a name-clearing hearing. To succeed on this claim, Floyd-Gimon must show defendants deprived her of a constitutionally protected liberty interest in her reputation without giving her "an opportunity to clear . . . her name."

Regardless of whether defendants deprived Floyd-Gimon of a liberty interest in her reputation, she cannot establish a due process violation because she did not sufficiently, if at all, request a name-clearing hearing. An employee must request a name-clearing hearing in order to be entitled to one. See Winskowski v. City of Stephen, 442 F.3d 1107, 1112 (8th Cir. 2006). Floyd-Gimon says she requested a name-clearing hearing "at the time she filed her grievance[, asking] to be able to respond to the allegations to a review panel." Defendants maintain Floyd-Gimon did not "adequately alert [UAMS] that she was complaining of a lack of due process in connection with a liberty interest as opposed to making a grievance dispute over a policy interpretation or a lack of process associated with a perceived [property] interest in her job."

Our circuit has not addressed the specificity with which an employee must request a name-clearing hearing. The Fifth Circuit held,

> where the only issue was [the employee's] guilt or innocence of the particular charge that stigmatized him, his request to participate in established grievance, appeals, or other review procedures to contest defamatory charges was sufficient to state a request for a name-clearing hearing. A discharged employee need not use the term "name-clearing hearing."

Rosenstein v. City of Dallas, Tex., 876 F.2d 392, 396 (5th Cir. 1989).

-9-

The Sixth Circuit distinguished Rosenstein, requiring a plaintiff to "ask specifically for a name-clearing hearing when the plaintiff raise[s] both liberty and property deprivation claims." McManamon v. Charter Twp. of Redford, 238 F.3d 422, 2000 WL 1888616, at *6 n.9 (6th Cir. Dec. 19, 2000) (unpublished table opinion).  The Sixth Circuit found Rosenstein distinguishable because the only issue in Rosenstein was the truth or falsity of the stigmatizing charge—and not the degree of process involved in the termination decision itself.  See Ludwig v. Bd. of Trs. of Ferris State Univ., 123 F.3d 404, 411 (6th Cir. 1997); see also Rosenstein, 876 F.2d at 396.  By contrast, the Sixth Circuit concluded a plaintiff's letter accusing his employer of denying him due process did not state a request for a name-clearing hearing because it "was insufficient to alert the [employer] that [the employee] was complaining of a lack of due process in connection with a liberty interest as opposed to a lack of due process in connection with his claimed property interest, a claim which he had been asserting for some time." Ludwig, 123 F.3d at 411.

The distinction the Sixth Circuit identified in Ludwig is an important one. Where, as in Rosenstein, the only issue a discharged employee raises in a grievance is the truth or falsity of the stigmatizing charge, the grievance implicates only a liberty interest.  See Rosenstein, 876 F.2d at 396.  Where an employee asserting a lack of due process regarding a property interest in continued employment does not specifically mention a reputational interest, the employer does not have notice of the need for a name-clearing hearing because the type of process due depends on the interest asserted.  Compare Young, 244 F.3d at 627 ("A public employee with a protected property interest in continued employment receives sufficient due process if he [or she] receives notice, an opportunity to respond to the charges before his [or her] termination, and post-termination administrative review."), with Rush, 579 F.3d at 912-13 (explaining that a plaintiff requesting process with regard to a liberty interest must receive a public name-clearing hearing after the stigmatizing statements are made public).

The present case is more similar to Ludwig than to Rosenstein. Floyd-Gimon's grievance generally complained that she was denied "due process in the disciplinary process." She did not mention an interest in her reputation. She asked to be able to review the documents at issue, to have a chance to address the charges "to determine what discipline, if any, [was] appropriate," and to be reinstated. Thus, Floyd-Gimon's grievance did not target "the truth or falsity of the charge that stigmatized" her, Rosenstein, 876 F.2d at 396, and therefore Floyd-Gimon's communications were, as a matter of law, "insufficient to alert [UAMS] that [Floyd-Gimon] was complaining of a lack of due process in connection with a liberty interest as opposed to a lack of due process in connection with [her] claimed property interest," Ludwig, 123 F.3d at 411. The district court properly granted summary judgment on Floyd-Gimon's due process liberty interest claim.

## C.    Equal Protection Claim

This court analyzes discriminatory intent in claims—such as Floyd-Gimon's—asserting gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause in "essentially the same" manner as claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. See Hill, 696 F.3d at 712 (quoting Tipler v. Douglas Cnty., 482 F.3d 1023, 1027 (8th Cir. 2007)). "[A]n employee may survive an employer's motion for summary judgment" either by producing "direct evidence of discrimination," or "by showing a genuine dispute for trial under the burden-shifting framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-05 (1973)." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 860 (8th Cir. 2009) (parallel citation omitted).

> Under McDonnell Douglas, the plaintiff first must establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for discharging the employee. If the employer meets this burden, then the employee must show that the

-11-

employer's proffered reason for firing [her] is a pretext for unlawful discrimination.

Id.

After finding no direct evidence Floyd-Gimon's termination was motivated by gender discrimination, the district court engaged in the McDonnell Douglas analysis. The district court found, regardless of whether Floyd-Gimon had shown a prima facie case of gender discrimination, defendants had proffered a legitimate, non-discriminatory reason for terminating Floyd-Gimon—altering patient records. The district court focused on whether Floyd-Gimon had shown sufficient threshold evidence that this reason was a pretext for gender discrimination. The district court determined she had not.

### 1.    No Direct Evidence of Discrimination

Direct evidence of discrimination shows "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" McCullough, 559 F.3d at 860 (quoting Russell v. City of Kan. City, Mo., 414 F.3d 863, 866 (8th Cir. 2005)). The direct evidence must "clearly point[] to the presence of an illegal motive." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). Such evidence may be circumstantial. See id. Direct evidence does not include "'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir. 2000) (quoting Fast v. S. Union Co., 149 F.3d 885, 890 (8th Cir. 1998)).

During White's deposition, White testified that he would have wanted to see the allegedly altered records if he were in Floyd-Gimon's position, even though Floyd-Gimon did not have that opportunity. Counsel continued to question White as follows:

-12-

Q.      Okay. So why would you want to see [the altered documents at issue] if you are being fired for falsifying documents, but you don't think [Floyd-Gimon and Belcher] should have seen them?
A.      I'm me and they are them.
Q.      What's the difference?
A.      We're different.
Q.      Why are you different?
A.      Because we are.
Q.      Why? Give me how you're different.
A.      I'm different in that I am 80. I don't know how old they are. They are male - - I mean they are female and I'm male. We're different.

White went on to say that he would not have been entitled to any more of a hearing than Floyd-Gimon received, were he in Floyd-Gimon's position. Floyd-Gimon asserts White's remark that Floyd-Gimon is different because she is female is direct evidence White denied Floyd-Gimon a hearing because of discriminatory animus.

The district court held this was not direct evidence of gender discrimination because

White did not testify that gender was a factor in [Floyd-Gimon's] termination. In fact, he testified that he would have been afforded the same grievance process as that afforded [Floyd-Gimon]. White was not involved in the decision to terminate [Floyd-Gimon]. [Floyd-Gimon] complains that White affirmed her termination without referring the matter to a grievance panel. White testified that even he would not have the right to have a panel appointed.

We need not decide whether White's remark about Floyd-Gimon's gender "'reflect[s] a discriminatory attitude,'" King v. Hardesty, 517 F.3d 1049, 1058 (8th Cir. 2008), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011) (en banc) (quoting Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991) (reasoning remarks by an employer may be direct

-13-

evidence of discrimination if they "reflect a discriminatory attitude")), because White was not involved in the decision to terminate Floyd-Gimon and his remark about Floyd-Gimon's gender did not relate to any decision to deny Floyd-Gimon a hearing. See Clearwater, 231 F.3d at 1126 (excluding from the definition of direct evidence "'statements by nondecisionmakers'" and "'statements by decisionmakers unrelated to the decisional process'"). White's remark concerned why Floyd-Gimon was not shown the allegedly altered documents. Floyd-Gimon does not assert on appeal she was denied an opportunity to view the documents because of gender discrimination. White also stated he would not have been entitled to a public hearing were he in Floyd-Gimon's position. White's comment is not evidence that "clearly points to the presence of an illegal motive," Griffith, 387 F.3d at 736, for any challenged employment decision. The district court did not err in finding Floyd-Gimon failed to show direct evidence of discrimination.

### 2. Pretext

Floyd-Gimon claims the defendants' explanation for terminating her was a pretext for gender discrimination because several male nurses and two male physicians were similarly situated to her, but received more lenient treatment. To show pretext, Floyd-Gimon faces a "'rigorous'" test to show more leniently disciplined male employees were "'similarly situated in all relevant respects.'" Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 955-56 (8th Cir. 2012) (quoting Rodgers v. U.S. Bank, 417 F.3d 845, 853 (8th Cir. 2005), abrogated on other grounds by Torgerson, 643 F.3d at 1043, 1058 app.). "'[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" Id. at 956 (quoting Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)).

Floyd-Gimon argues the district court erred in finding no evidence of pretext by appearing "to conclude that comparator evidence could only be considered if one

comparator could meet the standard." Floyd-Gimon suggests "the standard should have been lowered by the fact that Floyd-Gimon offered multiple comparators." Floyd-Gimon does not identify any cases supporting this proposal, which is contrary to established law. See, e.g., id.

Floyd-Gimon does not challenge the district court's conclusion that the male employees Floyd-Gimon identified, considered separately, were not "similarly situated in all relevant respects." Id. Nor could she do so in good faith. Even assuming the charges against Floyd-Gimon were not more serious than those faced by the male employees Floyd-Gimon identifies, Floyd-Gimon did not produce any evidence her comparators had the same supervisor, or performed similar duties and were subject to the same standards or engaged in the same conduct without similar discipline. See Bone, 686 F.3d at 956. The physicians identified by Floyd-Gimon were not similarly situated because they were physicians, whereas Floyd-Gimon was a nurse coordinator with different professional responsibilities. See Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 807 (5th Cir. 2007) ("We cannot assume, nor require, that hospitals discipline doctors and nurse coordinators in an identical fashion."). Of the male nurses Floyd-Gimon identifies, none performed the same duties as Floyd-Gimon or were subject to the same standards of the Liver Transplant Department. See Bone, 686 F.3d at 956.

In her reply brief, Floyd-Gimon asserts pretext can be inferred from defendants' "shifting explanations for Floyd-Gimon's termination." Floyd-Gimon waived this argument by not asserting it in her opening brief. See Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004).

The district court correctly concluded Floyd-Gimon did not show the defendants' explanation for terminating her was a pretext for gender discrimination.

**III. CONCLUSION**

We affirm the district court's grant of summary judgment to defendants.

_____